Corrinda SPAULDING, Plaintiff–Appellant,

v.

William A. HALTER, Acting Commissioner of Social Security, Defendant–Appellee.*

No. 00–3738.

United States Court of Appeals, Seventh Circuit.

Argued March 7, 2001.

Decided March 28, 2001.

---

* William A. Halter, the acting Commissioner of Social Security, is substituted as defendant for Kenneth S. Apfel, the former Commissioner of Social Security. Fed. R.App. P. 43(c)(2).

Before Hon. DIANE P. WOOD, Hon. TERENCE T. EVANS, Hon. ANN CLAIRE WILLIAMS, Circuit Judges.

### ORDER

Corrinda Spaulding applied for social security benefits, alleging disability due to a hiatal hernia, gastroesophageal reflux, chronic dyspepsia, and erosive gastritis that resulted in uncontrollable vomiting and extreme abdominal pain. The administrative law judge (ALJ) concluded that Spaulding was not disabled and could return to her past job as a bank teller, and the Appeals Council denied Spaulding's request for review. Spaulding now appeals from the district court's decision upholding the denial of benefits. Because the ALJ's opinion contains a substantial number of omissions and errors that bear materially on his finding of no disability, we reverse the judgment of the district court and remand to the agency for further proceedings.

### I.  Background

Spaulding, who was thirty-one years old at the time of the agency's final decision, has a high school degree and has held ten different jobs in the span of approximately eleven years. She apparently first started suffering stomach-related ailments in 1986, and in 1988 received emergency room treatment for "burning left upper quadrant pain associated with nausea and vomiting." Later, Spaulding was referred to a Dr. Michael Colligan, who in 1988 noted a two-year history of symptoms of hyperacidity manifested by burning epigastric pain, nausea, and vomiting. Dr. Colligan further noted that Spaulding had bowel irregularity with alternating diarrhea and constipation (sometimes not having a bowel movement for three days) and that test results showed duodenitis with possible erosions. He prescribed "Reglan," "Zantac," and "H2 blockers" on a trial basis.

Spaulding did not see Dr. Colligan again until April 1992, when she returned complaining once more of nausea, vomiting, and alternating diarrhea and constipation. Dr. Colligan observed that although Spaulding's condition had initially improved from the medication, her symptoms had returned sometime in 1991. Specifically, she had been experiencing "recurrent symptoms of postprandial nausea and vomiting, and attacks of constipation followed by bouts of diarrhea," and typically would go three to five days without a bowel movement. Diagnostic studies showed that Spaulding had a small hiatal hernia with gastroesophageal reflux.

Dr. Colligan prescribed more medication, but in July 1992 Spaulding returned, again complaining of recurrent

nausea, vomiting, and dry heaves. Dr. Colligan noted that Spaulding would have dry heaves "repeatedly over 30 to 60 minute intervals." According to the doctor's notes, these symptoms "persisted in spite of continuing the medication."

In August 1992 Spaulding underwent an endoscopic examination. Dr. Colligan's preoperative diagnosis was "chronic dyspepsia refractory to medical therapy with H2 blockers." Following the examination Dr. Colligan diagnosed erosive gastritis and further observed that Spaulding had a small hiatal hernia with increased secretions in the stomach. He prescribed more medication, and approximately one month later Spaulding called to inform him that she was "feeling much better," that her regimen was working, and that the problem was "milk products."

But by December 1993, Spaulding was again experiencing stomach pain with nausea and vomiting, and she went to see a primary care physician, Dr. Eugene Loftin, apparently unable to afford Dr. Colligan's services at the time. Dr. Loftin examined her and prescribed Pepcid and more Reglan. Several days later Spaulding called Dr. Loftin's office to tell him that she needed a note for work because her employer did not believe that she was really sick and she was about to be fired. At Spaulding's request, Dr. Loftin then wrote her employer, stating that she was under his care for "severe stomach pain" but could "continue to work her usual job." Spaulding alleges that despite Dr. Loftin's note, she was fired shortly thereafter because of frequent absences due to her illness.

According to Dr. Loftin's notes, Spaulding missed her next two appointments in December 1993 and January 1994. When she next saw him in May 1995, he prescribed more Reglan and Zantac. Approximately one year later, Spaulding returned requesting medication refills but was informed that she could not have refills without an examination. Spaulding apparently could not afford an examination, however, and thus did not receive any medication at this time.

In July 1996 Spaulding returned to Dr. Colligan, who reviewed Spaulding's medical file and noted that although her symptoms had "responded partially to H2 blockers and Prilosec" in the past, the medication had "not [been] completely effective because some of her symptomatology was due to non ulcer dyspepsia." He further reported, however, that "since [Spaulding] has been off work for the past three years she has felt as well as she ever has. She has lost 40 lbs. and kept it off. She is only having minimal dyspepsia, occasional episodes of nausea and dry heaves. Bowel pattern is normal."

Spaulding filed for disability benefits in September 1996, alleging December 16, 1993, as the onset of her disability. Thereafter, in October 1996, the Bureau of Disability Determination Services in Springfield, Illinois, sent Dr. Colligan a disability evaluation report form, requesting that he provide specific information to fourteen questions regarding Spaulding's medical condition. Dr. Colligan noted in this report that Spaulding had duodenitis, a hiatal hernia, and erosive gastritis. He further reported Spaulding's belief that employment-related stress caused her symptoms to become intolerable. In response to the form's final question regarding Spaulding's ability to do work-related activities, Dr. Colligan stated that "she should not bend over or lift objects greater than twenty pounds because of hiatal hernia."

The Department of Health and Human Services of the Social Security Administration (SSA) later sent Dr. Colligan a "(General) Medical Report" form, which he returned in January 1997. This four-page

form was more open-ended in the sort of responses it requested. It invited the responding physician to include information concerning the severity and duration of impairment and consisted of five general sections, entitled "History," "Physical Findings," "Laboratory and Special Studies," "Diagnoses," and "Treatment and Response." Dr. Colligan completed only the section of the form entitled "Physical Findings" and noted gastroesophageal reflux and hiatal hernia. The remainder of the form he left blank. Nowhere in this second report was Dr. Colligan specifically asked, as he was in the October 1996 report, about Spaulding's ability to do work-related activities.

A consultative state agency physician reviewed Spaulding's medical record later in January 1997 and determined that she had no functional impairments affecting work-related activities. The physician noted Dr. Colligan's October 1996 report stating that Spaulding should not bend over or lift objects greater than twenty pounds due to her hiatal hernia, but rejected those findings because Dr. Colligan's January 1997 report never recommended any restrictions.

At a hearing in March 1998, Spaulding detailed a litany of physical problems that she had experienced since December 1993. For example, she testified that: (1) her weight had fluctuated; (2) she was dehydrated "all the time"; (3) she suffered from malnutrition, which affected her bowel, menstrual cycle, skin, and nails; (4) once every month or every other month, she would wake up to find herself vomiting in bed; (5) she had recurrent episodes of severe diarrhea and constipation; (6) she experienced "constant" and "severe" heartburn from vomiting bile; (7) she suffered from headaches, which increased the severity of her nausea; (8) she was often "weak," "disoriented," "dizzy," and "lightheaded"; (9) she experienced "constant" nausea; (10) she had "persistent and unpredictable" episodes of vomiting; (11) she suffered from severe abdominal pains, which felt "like a heart attack" and which made it difficult for her to breathe; and (12) she experienced "very painful" spasms and "hot flashes." According to Spaulding, physical and mental stress exacerbate her symptoms, and her abdominal pain and spasms regularly occur when she bends over or when she is vomiting. She further stated that she takes her medication as needed but has avoided taking more than two tablets per day because it "puts me to sleep."

Spaulding also testified as to her past work history and stated that she was fired from her last job as a bank teller because her employer got "tired" of her absenteeism. According to Spaulding, she would often become too ill to wait on customers and would stay in the bathroom vomiting, at times leaving early and missing work the next day. Spaulding maintained that she has tried to "change all the scenarios"—she tried changing shifts to see if the time of day made any difference and tried working in factories—but nothing helped. In each case she either left her job knowing she was going to get fired or because she actually was fired.

In a decision dated June 26, 1998, the ALJ concluded that Spaulding was not disabled under the five-step sequential analysis provided in 20 C.F.R. § 404.1520, as there was "no evidence that with proper followup and medication the claimant would not be able to work." The ALJ then found that because Spaulding retained the residual functional capacity (RFC) for light work activity, she could return to her past relevant work as a bank teller. On September 30, 1999, the Appeals Council denied Spaulding's request for review.

## II. Analysis

We review the findings of the SSA under the "substantial evidence" standard. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotations and citation omitted).

In this case, the ALJ's reliance on numerous factual errors, his failure to consider relevant lines of evidence, and his failure to build a logical bridge between the evidence and the result, *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996), preclude meaningful appellate review. First, the ALJ erroneously found that "[a]t the time [Dr. Colligan] completed his report in October 1996 ... [t]he only restriction on work activities was that she not lift over 20 pounds because of the hiatal hernia." It is apparent from this statement that the ALJ failed to consider the remaining portion of Dr. Colligan's opinion—that Spaulding "should not bend over." Further, the ALJ did not mention Spaulding's own testimony that she experiences severe abdominal pain and spasms when she bends over. We have repeatedly held that an ALJ's failure to consider a relevant line of evidence requires remand. *See, e.g., Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir.2000) ("The ALJ's failure to consider evidence of dizziness alone precludes us from evaluating whether substantial evidence existed to support the ALJ's finding....") (internal quotations and citation omitted); *Herron v. Shalala,* 19 F.3d 329, 334 (7th Cir.1994) ("Because of the ALJ's failure to consider the evidence relating to [the claimant's] hand impairment, we are unable to evaluate and determine whether substantial evidence existed to support the ALJ's finding."); *Schroeter v. Sullivan,* 977 F.2d 391, 395 (7th Cir.1992) (ALJ should have addressed treating physician's opinion that the claimant could bend and reach only occasionally). Here, the evidence relating to Spaulding's inability to bend could have an impact on the disability determination. *See* SSR 96–9p, 1996 WL 374185, at *8 (S.S.A.1996) ("An ability to stoop occasionally ... is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply....") The ALJ's failure to address that evidence thus precludes an informed review and requires that the case be remanded for further findings.

The Commissioner argues that the ALJ's rejection of the bending restriction is supported by the consultative state agency physician's conclusion that Spaulding had no functional impairments affecting work-related activities. But because the ALJ did not make any findings whatsoever regarding this line of evidence, it is impossible to tell what he did and did not rely on in making his determination. Further, even if the ALJ had expressly relied on the agency physician's finding, the reliability of that finding is doubtful at best. It is apparent from the physician's report that the only reason why he rejected Dr. Colligan's October 1996 conclusions regarding Spaulding's lifting and bending limitations was that Dr. Colligan's January 1997 report did not recommend the same restrictions. But Dr. Colligan was not asked in the January 1997 report, in contrast to the October 1996 report, to respond specifically to Spaulding's ability to do work-related activities. The different formats of the reports account for the alleged inconsistency; thus it cannot be inferred from the absence of any work-related restrictions in Dr. Colligan's second report that no such restrictions existed. *See Scivally v. Sullivan,* 966 F.2d 1070, 1076–77 (7th Cir.1992) (alleged inconsistencies in treating physician's reports

were due to the differing formats of the reports). And notably, the ALJ accepted Dr. Colligan's opinion that Spaulding should not lift over twenty pounds despite the consultative physician's conclusion that she had "no functional impairments."

Besides disregarding relevant evidence, the ALJ made several errors in describing Spaulding's testimony. For instance, the ALJ characterized Spaulding as stating that "she experiences one episode of vomiting every two months." But Spaulding in fact testified that she vomits *in bed* once every month or two months. Generally, however, her vomiting episodes are "persistent and unpredictable." Further, contrary to the ALJ's characterization of the testimony, Spaulding did not say that she has had "no episodes of dehydration or malnutrition" and that she "has maintained a constant weight of 135 pounds." Rather, Spaulding testified that she is dehydrated "all the time," that she suffers from serious malnutrition, and that her weight has fluctuated drastically.

Where an ALJ's decision on matters of fact is unreliable because of serious mistakes or omissions, reversal is required unless "no reasonable trier of fact could have come to a different conclusion." *Sarchet*, 78 F.3d at 309. Here, if the ALJ had properly characterized Spaulding's testimony and considered the cumulative effect of her symptoms, the case could have gone the other way. *See Dix v. Sullivan*, 900 F.2d 135 (8th Cir.1990) (claimant who suffered from frequent nausea, fatigue, diarrhea, and abdominal pain was disabled). This is especially true in light of Spaulding's assertions that she has lost ten different jobs because of absences due to her illness. *See id.* at 138 ("A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a

determination that the claimant can *hold* whatever job he finds for a significant period of time.")

Meaningful review is also not possible in this case because the ALJ failed to "build an accurate and logical bridge between the evidence and the result." *Sarchet*, 78 F.3d at 307. In his decision the ALJ found that "[t]here is simply no evidence that with proper follow up and medication the claimant would not be able to work." The ALJ provided little analysis to support this determination, however, stating only that:

> [I]n December 1993, Dr. Lofton stated that she could continue to work and it appears that leading up to July 1996, the claimant had not been on any medication that would have controlled symptoms if her work was stressful.... The claimant's medications are only taken on an as needed basis.

This cursory analysis of the evidence does not provide a logical bridge to the ALJ's conclusion. As an initial matter, the ALJ erroneously stated that Spaulding "had not been on any medication" from December 1993 to July 1996; the record in fact reflects that Spaulding received a new prescription in December 1993 (it is unclear how long this prescription lasted her) and a refill in May 1995. Further, as this court has held, the taking of medications "as needed" is not inconsistent with a claim of disability. *Herron*, 19 F.3d at 336. Given the episodic nature of Spaulding's symptoms, it is entirely reasonable that she take her medications on an "as needed" basis, especially in light of her testimony that she tries to avoid taking too much medication because it makes her drowsy. *Cf. Green v. Apfel*, 204 F.3d 780, 781 (7th Cir.2000) ("That [claimant] has not been prescribed heavier painkillers ... cannot be thought compelling evidence of lack of severity of pain, since heavy painkillers often have serious side effects....")

The ALJ also failed to properly contextualize Dr. Loftin's December 1993 letter stating that Spaulding could "continue to work her usual job." The record shows that Dr. Loftin's letter was not intended to assess Spaulding's functional capacity but rather was prepared, at Spaulding's own request, to placate an employer who she feared was going to discharge her for her absenteeism. Given the circumstances in which the letter was written, the ALJ accorded it too much weight in deciding that Spaulding's condition was medically manageable. *See Wilder v. Chater,* 64 F.3d 335, 337–38 (7th Cir.1995) ("The fact that someone is employed is not proof positive that he is not disabled, for he may be desperate and exerting himself beyond his capacity. . . .") This is especially true considering that the record is replete with other evidence showing that Spaulding's ailments persisted in spite of taking medication.

The ALJ also found that "[t]he claimant's testimony . . . failed to further narrow the residual functional capacity." But again the ALJ failed to build a logical bridge from the evidence to the conclusion. Spaulding testified that she has persistent vomiting, nausea, diarrhea, constipation, headaches, heartburn, dizziness, and abdominal pain. She further stated that physical and mental stress exacerbate her symptoms and that she was fired from her previous jobs because of frequent absences due to her condition. If the ALJ believed this testimony, it is difficult to see how he concluded that Spaulding's complaints failed to narrow her RFC. *See Dix,* 900 F.2d at 137 (severe pain, nausea, fatigue, diarrhea, and other symptoms rendered claimant disabled); *see also Clifford,* 227 F.3d at 873–74 (the ALJ improperly disregarded claimant's complaints of pain in making his RFC determination).

Perhaps, as the Commissioner argues in his brief, the ALJ considered Spaulding's complaints regarding her various medical ailments but did not find those complaints to be credible. If the ALJ disbelieved Spaulding's testimony, however, he was required to say so in his opinion and give reasons why. *Schroeter,* 977 F.2d at 394–95 ("[W]e cannot presume that the ALJ disbelieved all of [the claimant's testimony] without any explicit findings to that effect.") (internal quotations and citation omitted). As best as we can discern from his opinion, if the ALJ did in fact discount Spaulding's testimony, his only grounds for doing so are that she takes her medication on an "as needed" basis and that Dr. Loftin stated in December 1993 that she could "continue to work her usual job." But as discussed above, the ALJ gave improper weight to this evidence, which therefore cannot serve to undermine Spaulding's testimony in its entirety.

In sum, because of the numerous errors and omissions in the ALJ's opinion, we are unable to evaluate and determine whether substantial evidence existed to support his finding of no disability. On remand the ALJ must consider the full range of medical evidence, with due regard for Dr. Colligan's opinions, and conduct a reevaluation of Spaulding's testimony. Further, given that the consultative state agency physician appears to have based his conclusions on a faulty premise—that Dr. Colligan's January 1997 report is inconsistent with his October 1996 report—the ALJ should summon an additional medical expert to examine Spaulding and reexamine her medical records in order "to provide an informed basis for determining whether the claimant is disabled." *Green,* 204 F.3d at 781 (citing 20 C.F.R. § 416.927(a)(3)). Finally, the ALJ should also summon a vocational expert to acquire additional information regarding the demands of the claimant's past relevant work. *See Winfrey v. Chater,* 92 F.3d 1017, 1025 (10th

Cir.1996); SSR 82–61, 1982 WL 31387, at *2 (S.S.A.1992).

For the above reasons, the judgment of the district court is REVERSED and the case is REMANDED to the agency for further proceedings.