In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3831

Donna J. Clifford,

Plaintiff-Appellant,

v.

Kenneth S. Apfel, Commissioner
of Social Security,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 98-1695-C-Y/S--Richard L. Young, Judge.

Argued May 18, 2000--Decided September 14, 2000

Before Posner, Diane P. Wood, and Williams, Circuit
Judges.

Williams, Circuit Judge.  Donna J. Clifford
applied for supplemental security income ("SSI")
under Title XVI of the Social Security Act, 42
U.S.C. sec.sec. 1381 et seq., alleging a
disability resulting from high blood pressure,
depression, double vision, arthritis in her legs,
pain in her hands, and back and nerve problems.
Clifford's claim was denied initially, upon
reconsideration, and after a hearing before an
Administrative Law Judge ("ALJ"). The ALJ
determined that Clifford was not "disabled"
within the meaning of the Social Security Act.
The Appeals Council declined review and the ALJ's
decision became the final decision of the
Commissioner of Social Security ("Commissioner").
Clifford sought judicial review of the
Commissioner's decision denying her SSI benefits,
and the district court affirmed the Commissioner.
We reverse.

I
A.  Administrative Hearing
     At the time of the administrative hearing,
Clifford was 53 years old, 5'3" tall, and weighed
199 pounds. She testified that she has a twelfth
grade education. Her only work experience was as
a waitress in 1965. She stated that she shared a
three room apartment with her husband, where she

does some housework, including cooking, vacuuming, making the bed, washing dishes, and grocery shopping. She is able to take a shower and dress herself. She further stated that she does not engage in many social activities outside of visiting her daughter and grandchildren. She testified that on a few occasions she babysat her grandchildren. At her doctor's suggestion, Clifford stated that she walks for exercise. She testified that she walks six blocks to visit her daughter's house in the summertime. During the walks (six blocks each way), she stated that she must sit and rest (near the fourth or fifth block) due to pain in her legs.

According to Clifford, she is unable to work because of nerve and vision problems and her inability to lift significant weight or sit, stand or walk on a sustained basis. She explained that she is nervous around people and often cries for no apparent reason. She further reported that she wears an eye patch to avoid double vision. She testified that she experiences pain in both hands and often drops things due to numbness in her left hand. She also testified that she can lift a 20 pound sack of potatoes. She stated that she experiences pain in both her legs, which requires her to sit or lie down periodically throughout the day. However, she testified that she can sit for about two hours at a time. Clifford further reported that she is taking prescription medications for depression, sinus, arthritis, and pain problems.

B.        Medical Evidence

1.  Ball Memorial Hospital

From 1994 to 1996, Clifford made frequent visits to the emergency room ("ER") at Ball Memorial Hospital./1 In 1994, she made several ER visits because she experienced symptoms of high blood pressure; each time she was treated with medication and released. In January 1995, Clifford returned to the ER complaining of shoulder and back pain. The attending ER physician, Dr. Gary Gaddis, M.D., prescribed pain medication and released her. Six months later (in July), she made another ER visit, this time complaining of knee pain. On examination, Dr. Iguban Querubin, M.D., found positive tenderness in both of her knees. Dr. Querubin diagnosed arthralgia (joint pain) in Clifford's right knee and prescribed medication. Later that month, Clifford returned to the ER complaining of arm pain. She received a diagnosis of radiculopathy (nerve root disease) with cervical and left arm pain.

The following January (1996), Clifford went to

the ER after she slipped and fell on her right knee. An x-ray showed no acute abnormalities but indicated a marked amount of degenerative change. On April 7, 1996, she entered the ER complaining about leg pain. Dr. Max H. Rudicel, M.D., indicated that her problems were associated with degenerative arthritis. In November of that year, Clifford returned to the ER complaining of a possible cerebrovascular accident (i.e., a stroke). She was admitted and referred to a clinical neurologist, Dr. Jay G. Panszi, M.D., who reported that her problems were caused by microvascular brain stem disease that was aggravated by her high fat diet. At one point during her many ER visits, Clifford was described as a "well-developed, well-nourished" woman.

2. Dr. Jeffrey A. Heavilon, M.D.

On August 10, 1995, Clifford saw Dr. Jeffrey A. Heavilon at Central Indiana Orthopedics, P.C., complaining of left arm and neck pain. At that examination, Clifford wore a cervical collar and a wrist splint. Dr. Heavilon described Clifford as a "healthy appearing" woman who was in no acute distress. He reviewed x-rays of her cervical spine and noted that they showed degenerative arthropathy (joint disease), with some radiculopathy (nerve root disease) in her left shoulder. He recommended continued conservative treatment, including use of a Prednisone Dosepak. Dr. Heavilon later reported that Clifford's left shoulder pain improved with the use of the Prednisone Dosepak, but noted that Clifford also complained about pain in her right foot.

3. Dr. Cheryl Keech, M.D.

At the request of the Social Security Administration, Clifford saw Dr. Cheryl Keech, a consulting physician, on August 16, 1995. Dr. Keech described Clifford as an "obese" woman who moved about the examination room without difficulty and showed no signs of shortness of breath or fatigue. Dr. Keech indicated that Clifford had no anatomical deformities, inflammation, or swelling. She noted that Clifford's range of bodily motions was normal and that her grip strength was intact. She also recorded Clifford as having no loss of hand functioning. Dr. Keech did find pain with palpation in Clifford's right ankle and both knee joints. She also found mild muscle spasm in Clifford's upper cervical area across her shoulder. She reported that Clifford had arthritis and "very high" blood pressure. She further stated that Clifford had a pinched nerve in her neck that caused pain, but indicated that

the pinched nerve had not caused any loss of functioning or any nerve damage. Dr. Keech recommended that Clifford consult an ophthalmologist for her vision problems.

4.Open Door Health Clinic/Dr. Arnold L. Carter, M.D.

In February 1996, Clifford saw Dr. Arnold L. Carter at the Open Door Health Clinic, a community health clinic where she sought medical treatment from 1981 until the hearing. On examination, Dr. Carter diagnosed arthritis in Clifford's knee joints and probable carpal tunnel syndrome in her left wrist (but a treatment note from a prior visit to the clinic indicated that Clifford had "good grip" strength in her left hand). Dr. Carter recommended that Clifford continue taking medication for arthritis and that she continue using her carpal tunnel brace. A month later, Dr. Carter noted that Clifford still had problems with pain in her wrists and knees. That April, Dr. Carter examined Clifford and found tenderness in her knee joints. Dr. Carter observed that Clifford had "marked excessive weight" and recommended that she monitor her dietary fat intake. Three weeks later, Clifford returned to Dr. Carter complaining about bilateral knee pain and swelling and shortness of breath. The following December, Dr. Carter observed that Clifford walked with an unsteady gait and noted that she could not perform tandem walking. A treatment note from the clinic dated December 30, 1996, indicated that Clifford experienced pain in her left knee that extended to her thigh after she walked three blocks. Clifford also complained about numbness in her left hand and tightening of her fingers.

5. Dr. Andrew H. Combs, M.D.

In September 1996, Clifford saw her treating physician, Dr. Andrew H. Combs, an orthopedic specialist at Central Indiana Orthopedics, P.C., for pain in her right knee. Following an examination, Dr. Combs diagnosed right knee arthritis and suggested that Clifford would eventually require a total knee replacement. Four months later (January 1997), Clifford returned to Dr. Combs for left knee and bilateral hand pain that had persisted for at least a year. On examination, Dr. Combs opined that Clifford's history of bilateral knee osteoarthritis limited her ability to stand. Based on x-rays, he stated that her left knee showed degenerative arthritis in the medial joint space. Dr. Combs noted that this finding was similar to Clifford's right knee osteoarthritis. He also reviewed x-rays of both

her wrists. He noted that her hands showed mild joint osteoarthritis. He also diagnosed right arm paresthesias, but he indicated that this condition did not warrant electromyographic (EMG) testing. He recommended that if her paresthesias worsened, she could start using her wrist splints.

Consistent with his examination in September 1996, Dr. Combs indicated that Clifford would eventually require a knee replacement. According to him, Clifford's medical condition severely limited her ability to perform any work that required standing or walking. Dr. Combs also opined that Clifford was unable to perform work that required repetitive use of her hands. He further predicted that her double vision would severely limit her ability to perform reading and computer monitor work.

6. Dr. S.L. Rumschlag, O.D.

Following the hearing before the ALJ (but while the record remained open), Clifford saw Dr. S.L. Rumschlag on February 3, 1997. Dr. Rumschlag reported that Clifford's prior stroke had paralyzed the third and fourth nerve to her left eye. He opined that she had permanent double vision with no depth perception, which required her to wear a patch on each eye alternatively. He further indicated that Clifford could not see to her left or right depending upon which eye has the patch.

C. Other Evidence

1. Psychological Evaluations

In May 1995, Clifford saw Bob B. Hatfield, Ph.D., and Barbara Umberger, Ph.D., for a psychological evaluation in order to determine her eligibility for medicaid benefits. Clifford was tearful throughout the evaluation. Based on the results of the evaluation, which included a Weschsler Adult Intelligence Scale-Revised (WAIS-R IQ) test, Clifford was found to have a verbal IQ of 82 and a performance IQ of 88, which put her in the "low average" range of global intelligence. Clifford was also diagnosed as suffering from major depression, for which she was prescribed the anti-depressant medication Paxil.

In January 1997, Clifford saw Bill Frederick, Ph.D., a social worker and case coordinator at Comprehensive Mental Health Services for an emotional/behavioral assessment. Dr. Frederick described Clifford as an "overweight" woman. He

indicated that Clifford and her husband led a somewhat "active" social life because they played cards with friends and are involved with their grandchildren. He noted that Clifford's self-esteem was diminished and that she has had suicidal ideas. Dr. Frederick further reported a diagnosis consistent with dysthymic disorder (a chronic depressive mood).

### 2. Activity Reports

During the SSI eligibility determination process, Clifford filled out a number of reports that described her daily activities. She indicated that she cooks "simple" meals that do not require her to read a recipe. According to her, the meals she cooks only take thirty to sixty minutes to prepare. She also reported that she dusted and did laundry and that her household chores took about two hours to complete. She indicated that she had to rest while doing her household chores because of discomfort in her legs. She further indicated that her husband helps her cook and do household chores whenever possible.

### D. The Administrative Law Judge's Decision

In determining whether Clifford suffered from a disability as defined in the Social Security Act, the ALJ conducted the standard five-step inquiry. See 20 C.F.R. sec. 404.1520. The five-step inquiry required the ALJ to evaluate, in sequence:

(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], see 20 C.F.R. sec. 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985) (citation omitted). The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner. Knight, 55 F.3d at 313.

In conducting the sequential analysis, the ALJ determined that Clifford had not engaged in

substantial gainful activity since June 1, 1995. He also found that Clifford had a "severe" combination of impairments consisting of hypertension, arthritis, disorders of the spine, monocular vision, and affective disorders, but did not have an impairment, or a combination of impairments, which met or equaled in severity the requirements of any of the impairments listed in 20 C.F.R. sec. 404, Subpart P, Appendix 1 ("Listing"). As a result, the ALJ concluded that Clifford could not meet her burden at step three of the evaluation.

The ALJ then went on to discredit Clifford's testimony regarding her subjective complaints of pain, as well as her allegation of a total inability to work. Next, he determined that Clifford had no past relevant work or transferable work skills, which, in turn, led him to find that Clifford had the residual functional capacity to perform low stress light work,/2 but with certain limitations./3 Because of Clifford's residual functional capacity, her age, education, and work experience, the Medical-Vocational Guidelines ("guidelines") directed a conclusion that Clifford was not "disabled" as defined in the Social Security Act. Since Clifford's limitations did not allow her to perform the full range of light work, the ALJ alternatively relied on the guidelines as a framework for decision-making in conjunction with vocational expert testimony at step five of the evaluation. The ALJ found that there are significant jobs in the national economy that Clifford could perform. These jobs in Indiana include a hand packer, cook helper, and assembly worker.

On appeal, Clifford argues that (1) the ALJ improperly rejected the opinion of her treating physician, Dr. Andrew Combs; (2) the ALJ improperly evaluated her testimony regarding her subjective pain symptoms; (3) the ALJ erred in determining that she had the residual functional capacity to perform light work; and (4) the ALJ erred in failing to afford appropriate weight to the findings of other agencies regarding disability.

II

The Social Security Act, 42 U.S.C. sec. 405(g), requires the Commissioner's findings to be sustained if supported by substantial evidence. Therefore, we will reverse the Commissioner's findings only if they are not supported by substantial evidence or if the Commissioner applied an erroneous legal standard. Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). Substantial evidence means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In our substantial evidence determination, we review the entire administrative record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner. See Powers v. Apfel, 207 F.3d 431, 434-35 (7th Cir. 2000); Diaz v. Chater, 55 F.3d 300, 305, 308 (7th Cir. 1995); Luna v. Shalala, 22 F.3d 687, 689 (7th Cir. 1994). However, this does not mean that we will simply rubber-stamp the Commissioner's decision without a critical review of the evidence./4 See Ehrhart v. Secretary of Health and Human Servs., 969 F.2d 534, 538 (7th Cir. 1992).

A.  Dr. Combs's Opinion

    Clifford contends that the ALJ improperly rejected the disability findings of her treating physician, Dr. Combs. In his January 1997 report, Dr. Combs opined that Clifford was severely limited in her ability to perform any work requiring standing and walking. He also stated that Clifford could not perform any repetitive work due to her hand osteoarthritis and paresthesias. The ALJ declined to accord controlling weight to Dr. Combs's 1997 report on the grounds that it was unsupported by medical evidence and inconsistent with Clifford's description of her daily activities.

    Prior to reaching this determination, the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances. See Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982); 20 C.F.R. sec. 404. 1527(d)(2). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. sec. 404.1527(d)(2). A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is "disabled" or "unable to work." Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability. See 20 C.F.R. sec. 404.1527(e).

    Here, the ALJ stated that Clifford's description of her daily activities did not appear to preclude "all competitive work." In support of this contention, the ALJ noted that Clifford walks six blocks, performs household chores, and shops. According to the ALJ, these activities were inconsistent with Dr. Combs's opinion

regarding Clifford's limitation on performing work that requires standing or walking. We have repeatedly stated, however, that an ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." Scivally v. Sullivan, 966 F.2d 1070, 1076 (7th Cir. 1992). The ALJ did not provide any explanation for his belief that Clifford's activities were inconsistent with Dr. Combs's opinion and his failure to do so constitutes error.

We have likewise insisted that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. Rohan, 98 F.3d at 968 ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); see 20 C.F.R. sec. 404.1527(d)(2) ("We will always give good reasons . . . for the weight we give your treating source's opinion."). The record indicates that Dr. Combs found that Clifford suffers from degenerative knee arthritis that severely limits her ability to walk or stand on a sustained basis. In giving little or no weight to this finding, the ALJ did not cite to any medical report or opinion that contradicts Dr. Combs's opinion. In effect, the ALJ substituted his judgment for that of Dr. Combs and left unexplained why Clifford's activities were inconsistent with Dr. Combs's opinion. That was error. See Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) (noting that ALJ cannot, without adequate explanation, discount an uncontradicted, dispositive medical opinion). Moreover, it appears that the ALJ's view of Dr. Combs's opinion may have been affected by the ALJ's failure to consider Clifford's complaints of disabling pain (an error to be discussed later).

The ALJ also declined to give controlling weight to Dr. Combs's finding that Clifford is unable to perform repetitive work due to her hand osteoarthritis and paresthesisas. The ALJ noted that Dr. Combs indicated that Clifford has "mild" hand osteoarthritis and that her paresthesisas did not warrant an EMG test. The ALJ further noted that Clifford had no loss of hand functioning when examined August 16, 1995 (by Dr. Keech), and that a treatment note (from the Open Door Health Clinic) indicated that Clifford had "good grip" on January 18, 1996.

We note that Dr. Combs's 1997 report indicated that Clifford's bilateral hand pain had persisted for a year and a half before her examination (January 31, 1997). Dr. Keech's examination of Clifford apparently fell within that time period. In her report, Dr. Keech noted Clifford's

complaint of left arm pain, but she found no loss of hand functioning on the part of Clifford. Dr. Combs, on the other hand, determined that Clifford was unable to perform repetitive work due to her hand osteoarthritis and paresthesisas. Dr. Keech, unlike Dr. Combs, did not render any clinical findings with respect to Clifford's hand osteoarthritis and paresthesisas. This strongly suggests that Clifford's hand condition may have worsened after her examination by Dr. Keech./5 It does not appear from the record that the ALJ considered this possibility. Instead, the ALJ discounted Dr. Combs's disability finding because Dr. Combs stated that Clifford's hand osteoarthritis was "mild" and her paresthesisas did not warrant an EMG test. He apparently believed that Dr. Combs's 1997 report was inconsistent.

While internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion, Knight, 55 F.3d at 314 ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record), the ALJ here did not adequately articulate his reasoning for discounting Dr. Combs's opinion. Diaz, 55 F.3d at 308. In particular, the ALJ did not explain why these statements were necessarily inconsistent with Dr. Combs's finding regarding the disabling effect of Clifford's combined hand osteoarthritis and paresthesisas. Moreover, the ALJ did not, but should have, considered all relevant evidence (including Clifford's complaints of disabling pain) in weighing whether Clifford is disabled from repetitive work as found by Dr. Combs. Herron, 19 F.3d at 333 (noting that ALJ may not "select and discuss only that evidence that favors his ultimate conclusion"). In light of these errors, the ALJ must reevaluate whether Dr. Combs's disability findings are entitled to controlling weight.

B. Clifford's Testimony

Clifford contends that the ALJ improperly evaluated her testimony regarding her disabling pain. The ALJ supposedly did not find Clifford's testimony credible because it was contradicted by her daily activities and the medical evidence of record. However, the ALJ must consider a claimant's subjective complaint of pain if supported by medical signs and findings. Scivally, 966 F.2d at 1077; 20 C.F.R. sec. 404.1529./6 And even if the claimant's complaint is not fully supported by objective medical evidence, the court has instructed:

If the allegation of pain is not supported by the

objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

Luna, 22 F.3d at 691 (citation omitted). Although an ALJ's credibility determination is usually entitled to deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." Herron, 19 F.3d at 335.

Here, the ALJ stated, in a conclusory manner, that Clifford's testimony regarding the limitations placed on her daily activities was unsupported by the medical evidence. However, the record is replete with instances where Clifford sought medical treatment for pain symptoms related to her physical impairments, including the arthritic condition for which she is taking pain medication. While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision. See id. at 333. Most importantly, he must build an accurate and logical bridge from the evidence to his conclusion. Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000); Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998).

In this case, the ALJ does not explain why the objective medical evidence does not support Clifford's complaints of disabling pain. Rather, the ALJ merely lists Clifford's daily activities as substantial evidence that she does not suffer disabling pain. This is insufficient because minimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity. See Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) (ruling that the ALJ may not rely on minimal daily activities as substantial evidence that claimant does not suffer disabling pain). For example, Clifford testified that her typical household chores took her only about two hours to complete. Clifford indicated that she had to rest

while doing household chores. She stated that she cooks, but only simple meals. She also indicated that she could vacuum, but it hurts her back. She stated that she goes grocery shopping about three times a month and "sometimes" carries groceries from the car to the apartment. She further stated that she could lift a twenty pound sack of potatoes, but she "wouldn't carry it long." Clifford testified that her husband helps her with the household chores whenever possible. While she babysits her grandchildren, she indicated that her depression is aggravated while watching them. In regard to walking, Clifford stated that she walked to get exercise at her doctor's suggestion. However, she stated that she must rest after walking anywhere between three and five blocks. Clifford further indicated that she plays cards (two rounds) about twice a month. Thus, her testimony on her daily activities does not undermine or contradict her claim of disabling pain.

At this juncture, we lack a sufficient basis upon which to uphold the ALJ's credibility determination. On remand, the ALJ must conduct a reevaluation of Clifford's complaints of pain, with due regard for Dr. Combs's opinion and the full range of medical evidence.

C.  Residual Functional Capacity

Clifford further contends that the ALJ's finding that she had the residual functional capacity/7 to perform light work is unsupported by the record evidence. Before we address this argument, however, we revisit step three of the sequential analysis because we believe further proceedings are necessary for a redetermination of a multiple impairments analysis.

From the record, it appears that the ALJ failed to consider at step three the disabling effect of Clifford's weight problem on her overall condition. The regulations require the agency to consider the combined effect of all of the claimant's ailments, regardless of whether "any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. sec. 404.1523; see Green, 204 F.3d at 782. While Clifford did not claim obesity as an impairment when filing her Disability Report, the evidence should have alerted the ALJ that Clifford had another relevant impairment that could contribute to the cumulative effect of her other impairments. Cf. Fox v. Heckler, 776 F.2d 738, 740-42 (7th Cir. 1985) (medical expert should evaluate combined effect of claimant's impairments where evidence fairly raises issue); 20 C.F.R. sec. 404.1512(a) (Commissioner "will consider only impairment(s) you say you have or

about which we receive evidence."). There are numerous references in the record to Clifford's "excessive" weight problem. For example, Dr. Jay G. Panszi, a clinical neurologist, reported that Clifford's stroke symptoms were caused by microvascular brain stem disease that was aggravated by her high fat diet. Dr. Keech described Clifford as "obese," and Dr. Carter suggested that Clifford lose weight because of her medical condition. The record also indicates that Clifford has long had a weight problem. Indeed, before her doctor put her on a diet, Clifford testified that she normally weighed 224. Moreover, Clifford suffers from severe arthritis of the knees and high blood pressure, which are significantly related to obesity under Listing 9.09, 20 C.F.R. Part 404, Subpart P, Appendix 1. While Clifford may not meet the Listing requirements for obesity,/8 she is 5'3" and significantly overweight at 199 pounds. The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the weight issue with the aggregate effect of her other impairments. See Scott v. Heckler, 770 F.2d 482, 486 (5th Cir. 1985) (200 pounds on a 5'4" woman is significant obesity when present with a related impairment).

Because the record does not indicate that the ALJ properly considered the aggregate effect of all Clifford's ailments, we believe a redetermination of a multiple impairments analysis is necessary. If the ALJ believes that he lacks sufficient evidence to make a decision, he must adequately develop the record and, if necessary, obtain expert opinions. See Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997); Luna, 22 F.3d at 692-93.

Turning to Clifford's argument on the residual functional capacity, once the ALJ determined that Clifford had no past relevant work, he was required to establish that Clifford has the capability of performing other work in the national economy. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1984). The ALJ determined that Clifford retained the residual functional capacity to do a limited range of light work during an eight-hour workday. This finding must be supported by substantial evidence in the record. Here, the ALJ, without sufficient reason, disregarded significant conflicting evidence--for example, Dr. Combs's opinion, Clifford's complaints of pain, her weight problem, and her limited activities--in making his residual functional capacity determination. For meaningful appellate review, however, we must be able to trace the ALJ's path of reasoning. See Rohan, 98 F.3d at 971 (noting that ALJ's explanation must take into account significant evidence that would support

the opposite conclusion so that a reviewing court has some idea why the judge rejected it); Herron, 19 F.3d at 333. The ALJ's decision is riddled with inarticulate reasons for the result.

Because we believe that the ALJ erred in giving little or no weight to (1) Dr. Combs's opinion and (2) Clifford's complaints of pain (as well as other conflicting evidence), further proceedings are necessary for redetermination of Clifford's residual functional capacity should the ALJ's reevaluation reach step five.

D.   Disability Finding of Other Agencies

Clifford finally contends that the ALJ should have assigned some weight to the fact that an Indiana state agency found her disabled and eligible for medicaid benefits. However, the ALJ is not bound by findings made by either a governmental or nongovernmental agency concerning whether the claimant is disabled. See 20 C.F.R. sec. 416.904. As we stated earlier, the ALJ must independently determine if a claimant is "disabled" as defined solely in the Social Security Act. See Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996). Therefore, the ALJ is not required to (but may) consider the disability finding of other agencies.

III

For the reasons stated above, the judgment of the district court, upholding the Commissioner's decision to deny benefits to Clifford, is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion. We also suggest that the Social Security Administration transfer the case to a different ALJ on remand. See Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

/1 Clifford has had hypertension (high blood pressure) since 1974 and she suffered a stroke in 1989.

/2 According to Social Security regulations, "light work" is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding and turning objects. See 20 C.F.R. sec. 404.1567(b); Social Security Ruling 83-10. The use of the term "low stress" is somewhat of a misnomer because stress lies in the individual not in the job. See Social Security Ruling 82-62.

/3 The ALJ found that Clifford retained the ability to perform light work that can be performed by "a person with monocular vision that requires an eye patch." The work could not require her to walk more than thirty minutes at one time or sit for more than two hours at one time. Other limitations on her ability to perform light work included "no operation of foot controls; no continuous grasping with the left hand; no operation of heavy machinery; no driving; no unprotected heights; avoidance of slippery and uneven surfaces; and limited contact with the public."

/4 We also review the final decision of the Commissioner without giving any deference to the district court's review of that decision. Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998).

/5 A month after the January 1996 treatment note, for example, Dr. Carter, who is also associated with the Open Door Health Clinic, diagnosed Clifford with probable carpal tunnel syndrome. Dr. Carter further noted that Clifford continued to have pain in her wrists in March 1996.

/6 The Social Security regulations provide that "there must be medical signs and laboratory findings which show that [the claimant] ha[s] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant] is disabled. In evaluating the intensity and persistence of [the claimant's] symptoms, including pain, we will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how [the claimant's] symptoms affect [the claimant]. . . . We will then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [the claimant's] ability to work." 20 C.F.R. sec. 404.1529(a).

/7 "Residual functional capacity" is that which a claimant can still do despite her physical and mental limitations. Hickman v. Apfel, 187 F.3d 683, 689 (7th Cir. 1999); 20 C.F.R. sec. 404.1545(a). The ALJ considers the claimant's ability to lift weight, sit--stand, walk, push--pull, etc., in reaching this determination. 20

C.F.R. sec. 404.1545(b). The claimant's residual functional capacity is used to determine her ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy). See id. sec. 404.1567.

/8 Under the regulations, a woman of Clifford's height is disabled if she weighs 250 pounds and also suffers from either persistent high blood pressure or arthritis in a weight-bearing joint. See 20 C.F.R. Part 404, Subpart P, Appendix 1, sec. 9.09 (Table II-Women).