James R. GIBSON, Plaintiff–Appellant,

v.

Larry G. MASSANARI, acting Commissioner of Social Security Administration, Defendant–Appellee.

No. 01–1483.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 7, 2001.

Decided Sept. 6, 2001.

Before Hon. COFFEY, Hon. KANNE, and Hon. WILLIAMS, Circuit Judges.

## ORDER

James Gibson appeals the district court's decision upholding the denial of his application for Social Security Disability Insurance benefits ("DIB"). Gibson contends that the administrative law judge's ("ALJ") decision is not supported by substantial evidence. We affirm.

### Gibson's Injuries And The Medical Evidence

Gibson was born in August 1942. He has a high school education. He was employed as a construction worker until April 2, 1991, when he claims he became unable to work full-time after he fell off a bridge and injured both knees, his left ankle, his neck, and his back. After the accident, Dr. Ronald J. Herrin, a surgeon at St. John's Hospital in Springfield, Illinois, performed arthroscopic surgery in August 1991 on Gibson's left knee to repair a medial meniscal [1] tear.

Two and a half months later, Gibson was referred to Dr. F. William Schroeder, the Medical Director at The Spine Center, Ltd. in Springfield, Illinois. Dr. Schroeder reported Gibson's complaints that his knee surgery exacerbated his knee problems, and that he had "a great deal of difficulty with [his left] leg." Dr. Schroeder's examination, however, revealed no sign of motor weakness and x-rays showed "no real significant degenerative disease in either [Gibson's] lumbar or cervical spine." A month or so later, Dr. Schroeder reviewed a magnetic resonance imaging ("MRI") scan of Gibson's neck and concluded that the results were normal. Dr. Schroeder opined that Gibson had a sprain in his neck and low back.

The following year, in March 1992, Gibson's chiropractor referred him to Dr. Edward Trudeau, the Director of Physiatry [2] Services at Memorial Medical Center in Springfield, Illinois, after Gibson complained of severe neck pain and headaches. Gibson also complained of diminished strength, numbness, and tingling in his hands. Dr. Trudeau's examination revealed that Gibson suffered symptoms consistent with carpal tunnel syndrome. Dr. Trudeau opined that using wrist splints and healing over time would allow Gibson to "continue improving and ... continue with lifestyle and work activities ... in less discomfort."

1. "Medial meniscal" refers to crescent-shaped cartilage of the knee joint. *Stedman's Medical Dictionary,* 1091–92 (27th ed.2000).

2. "Physiatry" is another term for physical medicine. *Stedman's Medical Dictionary,* 1380 (27th ed.2000).

Gibson returned to the Spine Center in January 1993 and underwent a Functional Capacities Evaluation, apparently in connection with preparing his DIB application. The evaluators, an occupational therapist and a physical therapist, concluded that Gibson could sit, stand, and walk for four hours each during an eight-hour workday as long as he could change positions for two to five minutes every half hour. The evaluators also reported that Gibson could not use his hands for "firm grasping" but could perform "gross manipulations." The evaluators concluded that Gibson could perform "light" work involving frequent lifting of up to ten pounds and occasional lifting of up to twenty pounds. They recommended that Gibson seek employment "between the sedentary and light physical demand of work."

In June and July 1994, Gibson saw Dr. Joshua Warach, a neurologist in Springfield. After examining Gibson, Dr. Warach recommended that he avoid heavy lifting, strain, and other undefined "provocative activities and maneuvers." After performing an electromyograph ("EMG") and nerve conduction studies on Gibson, Dr. Warach diagnosed Gibson with carpal tunnel syndrome, and opined that he probably could tolerate "light duty" work.

Gibson returned to the Spine Center in July 1995, at which time Dr. Schroeder reported some decreased range of spinal motion, and some cervical and lumbar disc degeneration. Dr. Schroeder commented that his findings could not explain Gibson's complaints of pain, except to say that Gibson "had a significant problem with pain management."

In November 1995 Gibson again visited his arthroscopic surgeon Dr. Herrin for examination in connection with completing a Central Laborers' Pension Fund Proof of Disability Form. Dr. Herrin examined Gibson and opined that his condition was unimproved, and that he would have "difficulty doing activities that involve much standing, lifting, or walking."

In March 1996 Dr. Gaylin Lack reviewed Gibson's x-rays and wrote a Residual Functional Capacity report for Gibson in connection with his DIB application diagnosing him with "(1) cervical strain, chronic; (2) osteoarthritis of left knee; (3) osteoarthritis, left ankle; (4) lumbar strain superimposed upon degenerative disc disease, lumbar." Dr. Lack noted that x-rays showed "minimal degenerative changes" in Gibson's left knee and "degenerative changes" in his left ankle. After examining Gibson, Dr. Lack reported that Gibson could lift or carry up to ten pounds occasionally (once an hour), that he "has significant limitation of his ability to stoop/bend," and that he could sit, stand, and walk only fifteen uninterrupted minutes each per hour. Dr. Lack also reported that "[r]eflexes of lower extremities are absent or difficult to elicit at least." Dr. Lack commented that Gibson "is probably disabled and probably not capable of sedentary work based on his physical limitations as well as his limitations in terms of educational background and experience."

In September 1996 Dr. Schroeder again reviewed Gibson's condition. In a letter to Liberty Mutual Insurance, Dr. Schroeder reported that Gibson suffered from degenerative arthritis in the left knee and degenerative disc disease in the lumbar spine. Dr. Schroeder opined that Gibson could return to work under the restrictions set forth in the Functional Capacities Evaluation that the Spine Center had completed back in January 1993. In a separate report entitled "Independent Medical Evaluation," dated the same day as the Liberty Mutual letter, Dr. Schroeder reported that he "found no evidence" of motor weakness in Gibson's lower extremities and that "there is nothing to account for

the extensive complaints of pain that [Gibson] has in his low back." Dr. Schroeder deferred to Dr. Lack regarding the severity of Gibson's left knee and left ankle arthritis, but disagreed with Dr. Lack's comment that Gibson was totally disabled, stating that Gibson "could be found a sedentary type job, which would involve a sitting position that he could change positions frequently."

### Gibson's Administrative Hearing

Gibson applied for DIB in October 1995, alleging that he was disabled beginning on April 2, 1991 (the date he fell from the bridge) as a result of problems with his knees, left ankle, neck, back and hands. Gibson's application was denied initially and on reconsideration, and Gibson sought a hearing.

At the hearing Gibson testified about his physical problems involving his hands, knees, ankles, neck and back. He testified that he had a "light grip" in his right hand that caused him to occasionally drop things. Nonetheless, Gibson said that he could use his right hand to turn a doorknob or open a car door, and that he could hold a hammer for up to twenty minutes before having to rest his hand for a half hour to an hour. Gibson also claimed unspecified problems using his left hand, but said it was stronger than his right hand. As for his ability to move around, Gibson claimed that he experienced tingling and numbness in both knees, and that his physical problems limited him to no more than forty-five minutes to an hour of sitting, standing or walking before needing to change positions for ten to fifteen minutes. He said he could walk up to a quarter of a mile at once at a slow pace, but that he would experience "severe" pain as a result and would become progressively weaker the more active he was. He claimed that, on one or two days a month, he experi-

enced such severe pain that he was unable to get up at all. Gibson said that his knee surgery had exacerbated his knee problems, that he could squat before the surgery but that he could not do so afterwards. He also claimed never to be free of back pain, which he said was aggravated by bending, sitting too long or standing too long. He testified that his ability to work would be further impaired by his neck problems; that he could turn his neck only as far as his shoulder before he experienced neck pain, which he associated with "throbbing headaches" that he said he experienced daily. Despite his claimed physical problems, Gibson testified that he did not take pain medication twenty to twenty-five days out of the month.

Gibson also testified about his activities. Every morning he went to a restaurant for coffee. He stated that he could usually drive for about an hour uninterrupted, and that he drove himself to the hearing–about a forty-five minute drive–without stopping. Gibson also performed some household chores, including (1) shopping for small items like soup or bread, (2) some seldom vacuuming, sweeping, and dusting, (3) taking out light trash bags, (4) helping his son work on cars by sliding under the car to supervise, (5) mowing his small lawn with a push mower, (6) making coffee, and (7) some occasional cooking. He also stated that he could climb the stairs in his house, but had to "take my time." Gibson also described his out-of-house activities, which included going to play bingo once a week and attending Moose Lodge meetings two or three evenings each week. Additionally, Gibson went quail and deer hunting; he hunted every day of the seven-day deer hunting season for a "couple of hours a day," and went quail hunting four times for a half-day each time. Gibson stated, however, that he obtained a permit from the state so that he could hunt while sit-

ting in his truck, and that he had to rely heavily on others for physical assistance.

A vocational expert ("VE"), John E. Grenfell, also testified at the hearing. The VE testified that Gibson could not perform any job if Gibson's testimony about his limitations were true or if Dr. Lack's opinion were accepted. By the same token, the VE testified that if the 1993 Spine Center report were accepted, Gibson could perform a significant number of jobs available in Illinois, including approximately 8,000 "custodial" jobs, 28,000 "watchman" jobs, and 5,000 delivery jobs.

### The ALJ's Decision

To determine if Gibson was disabled, the ALJ applied a five-step analysis, *see* 20 C.F.R. 416.920, which required him to evaluate, in sequence: (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment meets or equals a listed impairment in the appendix to the regulations; (4) if not, whether the claimant can perform his past relevant work; and (5) if not, whether the claimant can perform other work in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir.2001) (setting forth sequential analysis). If a claimant reaches step five, the burden shifts to the ALJ to establish that the claimant is capable of performing other work. *Id.* at 886.

The ALJ first determined that Gibson had not engaged in substantial activity since his alleged onset date of disability in April 1991. At steps two and three, the ALJ determined that Gibson had severe impairments–degenerative changes of the left knee, cervical pain syndrome, ankle pain, and lumbar disc disease–but concluded that they neither met nor equaled any listed impairment (a finding Gibson does not challenge).

At step four the ALJ concluded that Gibson could not return to his past job in construction, but that he had a residual functional capacity for "light work, with the limitations set forth in a January 1993 evaluation from the Spine Center." The ALJ weighed the 1993 Spine Center report against Dr. Lack's report, and rejected Dr. Lack's report. The ALJ reasoned that the 1993 Spine Center report was superior to Dr. Lack's report because (1) it was "well supported with objective findings" and more "comprehensive," (2) Dr. Lack's conclusion regarding Gibson's exertional limitations was inconsistent with her objective findings of "minimal" degenerative changes, and (3) the bulk of the record medical evidence was consistent with the conclusions in the 1993 Spine Center report. The ALJ also considered but discounted Gibson's testimony about his physical problems, finding it was inconsistent with the extent of his daily physical activity and his admission that he did not take any pain medication the majority of the time.

Based on the VE's testimony, the ALJ determined at step five that Gibson could perform a number of jobs available in the state, including delivery person, watchman, and custodian. Consequently, the ALJ denied Gibson's application for DIB. The district court upheld the ALJ's decision, and Gibson appeals.

### Analysis

We examine the entire record when reviewing the ALJ's decision, *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir.2000), and will affirm if the ALJ used the correct legal standards and the decision is supported by "substantial evidence," *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000). "Substantial evidence" means sufficient relevant evidence that a reasonable person would accept as adequate to support the

decision. *Id.* We will not substitute our judgment for that of the ALJ by reweighing the evidence to decide whether an individual is disabled. *See Powers v. Appel,* 207 F.3d 431, 434 (7th Cir.2000).

## I. The ALJ's Consideration Of The Medical Evidence.

■ Gibson principally contends that the ALJ ignored medical evidence favorable to him. Gibson argues that the ALJ failed to consider physicians' reports that—he says—prove he is not capable of "light" work. Gibson also argues that the ALJ failed to consider evidence that he is severely impaired by carpal tunnel syndrome, headaches, and cardiovascular problems.

The ALJ is required to give substantial weight to the medical evidence and opinions submitted, unless there is good cause for rejecting them, such as internal inconsistencies or inconsistencies with other evidence. 20 C.F.R. §§ 404.1527(c)-(d); *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.1995). The ALJ must articulate his analysis of the evidence to such a degree that we can follow his reasoning. *Zurawski,* 245 F.3d at 887. The ALJ may not select and discuss only the evidence that supports his conclusion; instead the ALJ's analysis should show that he or she considered all the important evidence, and will be deemed inadequate if the ALJ failed to consider an entire line of evidence. *Id* at 888.

### A. The Physicians' Reports.

The record belies Gibson's contention that the ALJ ignored physicians' reports favorable to him. Gibson highlights four reports—Dr. Lack's opinion, Dr. Schroder's September 1996 Independent Medical Evaluation, Dr. Herrin's November 1995 opinion, and the office notes of his family doctor, Dr. Theodore Little.

As we have said, the ALJ addressed Dr. Lack's opinion in detail, clearly explaining the reasons he rejected it. *See Schmidt,* 201 F.3d at 972 ("If reasonable minds can differ as to whether Schmidt is disabled, we must uphold the decision under review."); *Dray v. R.R. Ret. Bd.,* 10 F.3d 1306, 1315 (7th Cir.1993) (faced with "dueling doctors," the ALJ is entitled to decide which doctor to believe).

The remaining reports Gibson highlights are not inconsistent with the 1993 Spine Center report. As for Dr. Schroeder, Gibson argues that Dr. Schroeder's statement in his Independent Medical Evaluation that Gibson "could be found a sedentary type job, which would involve a sitting position that he could change positions frequently" is proof that he cannot perform light work. But Gibson misinterprets the statement; Dr. Schroeder was not opining about Gibson's physical limitations but instead was responding to Dr. Lack's assertion that Gibson was totally disabled and could not perform even sedentary work. In fact, on the same day that he wrote the Independent Medical Evaluation, Dr. Schroeder in a separate letter expressly reaffirmed the results of the 1993 Spine Center report. As for Dr. Herrin and Dr. Little, neither opined about Gibson's physical limitations. Dr. Herrin observed only that Gibson would have difficulty with activities that required "much standing, lifting, or walking," and our review of Dr. Little's notes revealed only his notation that Gibson experienced pain and swelling in his knees. The ALJ simply was not required to provide a complete written evaluation every piece of evidence, *see Zurawski,* 245 F.3d at 889, particularly here where the evidence not evaluated is consistent with the ALJ's decision.

### B. Gibson's Other Claimed Impairments.

Again, the record belies Gibson's assertion that the ALJ ignored evidence that he

was severely impaired by carpal tunnel syndrome, headaches, and cardio-vascular problems.[3] The ALJ expressly considered and rejected Gibson's claims of cardio-vascular problems, reasoning that "several evaluations have failed to confirm a heart condition." As for Gibson's carpal tunnel syndrome, the ALJ considered and discounted on credibility grounds his testimony about his ability to use his hands, and the medical evidence regarding his carpal tunnel syndrome (Dr. Warach's report) is consistent with the ALJ's decision; Dr. Warach opined that Gibson could perform "light duty" work. Finally, Gibson offered no medical evidence to show that his headaches affected his ability to function, and he ALJ considered and discounted his subjective complaints in this regard.

## II. The ALJ's Credibility Determination.

■ Gibson also contends that the ALJ erred in discounting his subjective complaints about pain. Gibson apparently believes that because the medical evidence–in his view–supported his testimony, the ALJ was required to entirely accept his complaints of pain. We will affirm an ALJ's credibility determination unless the appellant demonstrates that it is patently wrong. *Powers*, 207 F.3d at 435. The ALJ's credibility determination must include reasons for the finding that are supported by record evidence and must be specific enough to show the weight the ALJ gave to the claimant's testimony. *Zurawski*, 245 F.3d at 887 (citing Social Security Ruling 96–7p).

The ALJ's analysis satisfies this standard. The ALJ acknowledged that Gibson experiences pain, but observed that Gibson admitted he could perform at least some of the physical activity (*i.e.*, standing and sitting for up to an hour, walking for up to a half hour, lifting a gallon of milk) described in the 1993 Spine Center report. The ALJ also reasoned that the physical limitations Gibson claimed were inconsistent with the extent of his activities and the fact that he did not take pain medication the majority of the time. We note that although a claimant's ability to perform minimal daily activities does not establish that the claimant is capable of substantial physical activity, *see Clifford*, 227 F.3d at 872, here Gibson's activities (quail and deer hunting, leaving the house three to four nights per week to attend bingo games and Moose Lodge meetings, occasionally "sliding under the car" to assist son in repairs, mowing the law with a push mower, performing household chores) were not "minimal." *Compare Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir.1990) (claimant's testimony that he could help out around the house, carry groceries, set the table, ride a bike, and go hunting and fishing supported the ALJ's finding that claimant was not limited to sedentary work) *with Clifford*, 227 F.3d at 872 (performing some household chores, cooking simple meals, and occasional grocery shopping are "minimal" activities). Gibson has offered no evidence that the ALJ was patently wrong, and we thus defer to the ALJ's credibility determination.

---

**3.** Gibson also asserts that "[t]he ALJ inappropriately characterized Mr. Gibson's high blood pressure as 'fairly well-controlled' notwithstanding the medical evidence directly contradicting the ALJ's finding." Gibson fails, however, to identify any "contradicting" medical evidence. He thus waives the argument. *See Muhich v. C.I.R.*, 238 F.3d 860, 864 n. 10 (7th Cir.2001) (taxpayer waived argument that denial of certain deductions was erroneous where argument relied on bare assertions that "substantial authority exists" to support the claim and that "a review of the entire record" would establish the merits); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim [for appellate review].").

III. The ALJ's Reliance On The VE's Testimony.

Gibson's remaining contention is that the ALJ erred in accepting the VE's testimony because the jobs the VE proposed (custodian, watchman, and delivery person) are inconsistent with the jobs described in the Dictionary of Occupational Titles ("DOT").

There is some question whether the ALJ is entitled to rely on the VE's testimony if it is inconsistent with the DOT. *Compare Powers*, 207 F.3d at 436–37 (the ALJ "is entitled to rely on expert testimony that contradicts [the DOT].") *with Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 391–92 (7th Cir.1992) (remand was necessary for further analysis and explanation of evidence related to claimant's impairments where appeals council "relied on a vocational expert's testimony that does not jibe with standard references").

We need not reach this issue, however, because the jobs proposed by the VE are consistent with jobs listed in the DOT, as well as with the restrictions set forth in the 1993 Spine Center report. *See Dictionary of Occupational Titles*, Outside Deliverer, 230.663–010 (requires no climbing, balancing, stooping, kneeling, crouching, or crawling; requires frequent "reaching" and "handling"); Merchant Patroller, 372.667–038 (same); Cleaner/Housekeeping, 323.687–014 (requires no climbing, balancing, or crawling; requires occasional crouching and kneeling, requires frequent "reaching" and "handling"). The VE's opinion constitutes substantial evidence that Gibson can perform other work.

AFFIRMED.