**Benedicto D. FLORES, Plaintiff–Appellant,**

**v.**

Larry G. MASSANARI,* Acting Commissioner of Social Security, Defendant–Appellee.

No. 00–4334.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 2001.

Decided Sept. 13, 2001.

* Acting Commissioner Massanari is substituted as appellee for his predecessor, William A. Halter. *See* Fed. R.App. P. 43(c)(2).

Before MANION, DIANE P. WOOD, WILLIAMS, Circuit Judges.

**ORDER**

Benedicto Flores suffers from a severe, chronic blistering skin disease known as pemphigus vulgaris. Based on that affliction and the harmful side effects caused by high-dose steroid therapy, Flores sought social security disability benefits. An administrative law judge denied benefits on the ground that Flores had the residual functional capacity to perform a limited range of light work. The Appeals Council and the district court affirmed that determination, and Flores appeals. We conclude that the ALJ failed to provide Flores with adequate reasons for the decision and disregarded evidence favorable to Flores. We therefore vacate the district court's judgment and remand the case for further proceedings.

**I.**

Flores is an unskilled construction laborer with a sixth grade education. He was born in Mexico and came to United States in 1977 at the age of 25. His work in the United States has always involved heavy exertion-as a bricklayer, landscaper, and

black topper. He worked steadily from 1982–1995. Flores applied for disability insurance benefits in March 1996, alleging that he has been unable to work since December 23, 1995, when he was first hospitalized for intractable mouth and throat pain. Flores had been unable to swallow or eat because of the pain and consequently had lost 20 pounds.

During that hospital stay, a biopsy confirmed the diagnosis of pemphigus vulgaris. Pemphigus is a relatively rare but serious skin and mucous membrane blistering disorder. The blisters usually break out in the mucous membranes of the mouth and can later spread to other parts of the body. These blisters often rupture and ulcerate. Pemphigus is caused by an immune system that produces antibodies which attack skin cells. STEDMAN'S MEDICAL DICTIONARY 27th ed. (2000). Once a life-threatening illness with high mortality rates, pemphigus can now be controlled (but not cured) by the anti-inflammatory steroid Prednisone. The side effects of long-term Prednisone, however, can be significant, including muscle weakness, mood symptoms, diabetes, and risk of infection.

Flores has been continuously treated by two doctors since his diagnosis—Dr. John J. McGillen, an internist who specializes in infectious diseases, and Dr. Joan Guitart, a dermatologist. Dr. McGillen saw Flores approximately once a month from December 1995 until early–1998. During Flores' initial hospitalization in December 1995, the doctor initially treated the extensive ulcers and blisters in Flores' mouth with an "immediate aggressive high dose" of Prednisone–160 mg—and Imuran, an immunosuppressant. Nearly three weeks after his discharge, however, Flores was rehospitalized for severe pain and inability to eat or drink. A high-dose steroid treatment was resumed, and Flores was given a morphine patient–controlled administra-

tion pump to relieve his pain. Flores' condition improved, but Dr. McGillen remained concerned and referred Flores to a tertiary care center for additional consultation.

In January 1996 Flores proceeded to Northwestern Memorial Hospital, where he began treatment with Dr. Guitart. At Flores' initial visit, Dr. Guitart observed that Flores had "multiple erosions" in his mouth and treated him with Prednisone. At this time Flores was also diagnosed with diabetes. Dr. Guitart's treatment notes during the ensuing months reflect that Flores' condition continued to improve with Prednisone; she reported that Flores had no bleeding or exudation in his mouth, and his mouth lesions were slowly healing with treatment. She tapered the Prednisone from 90 mg/day in March to 60 mg/day in May, and she continued to reduce the Prednisone by 5 mg/week. In June Dr. Guitart recorded that Flores had no oral erosion and the pemphigus condition was "stable." In August Dr. Guitart noted that Flores had no active lesions and Flores no longer reported feeling pain when his cheeks were touched. An October visit revealed no erosions in Flores' mouth and Dr. Guitart discontinued the Prednisone.

The aggressive use of Prednisone, however, had triggered a host of complications, ranging from muscle pain and fatigue to an onset of diabetes that required Flores to take insulin. In response to a questionnaire by the Illinois Disability Determination Services (DDS), Dr. McGillen stated in April 1996 that "[b]ecause of the toxicity of the medication and his illness, . . . Flores is really unable to work at all at the present time at any capacity," and that "[c]onstant narcotics are required for his comfort." Around the same time, Dr. Guitart completed a DDS form in which she noted that the Prednisone had induced

diabetes as well as "muscle wasting," and that the oral erosions were responding only "very slowly" to treatment. In early November Dr. McGillen responded to a telephone inquiry from DDS regarding a new application for benefits that Flores had filed, and the doctor reported Flores' complaints of muscle wasting and back problems. When asked about Flores' current functional capacity, Dr. McGillen replied that it was "doubtful" that Flores "really could do anything in the way of employment" apart from "envelope sorting or something like that," but the doctor held out hope that Flores' condition would improve once the Prednisone dosage was lowered.

Instead Flores' condition declined. In mid-November Dr. McGillen noted that open sores had returned in Flores' mouth. Later in November Dr. Guitart confirmed that the pemphigus had flared up, and she pointed out oral ulcers on the wall of the left cheek and the left side of the tongue. She restarted Flores on 40 mg of Prednisone per day. One week later, Dr. Guitart spoke with Flores' stepdaughter, Maria Tonkin, who told her that Flores had gone to Mexico for a two-week trip but had been complaining of insomnia and depression similar to episodes previously suffered while on Prednisone. Dr. Guitart lowered the dosage to 20 mg. In mid-December Dr. Guitart gave a telephone report to DDS and stated that pemphigus is a "very unpredictable and chronic disease." Asked to explain how the pemphigus affected Flores' functioning, Dr. Guitart stated that the Prednisone was contributing to a condition known as myositis: "When the claimant had taken steroids in the past, he had been debilitated and complained of chronic tiredness, coughing and difficulties eating and drinking. Myositis is the name for this condition of chronic weakness that he has had. His myositis had been improving, but now that he is back on Pred-

nisone he is again complaining of aches, pains and weakness." Updating Flores' disease in a report she prepared the following month for Flores' private pension disability provider, Dr. Guitart emphasized pemphigus' seriousness and unpredictability. Though Flores' lesions remained localized, she cautioned that "generalized lesions could occur at any time, which would predispose him to infection, sepsis, and high output cardiac failure." To control this blistering process, Flores needed "chronic high doses" of Prednisone and Imuran. The Prednisone, however, "has caused a steroid-induced myopathy as well as chronic nonspecific arthralgia" (pain in the joints). Dr. Guitart summed up her the report by "stress[ing] that pemphigus vulgaris is a chronic, severe, life-threatening disorder." Despite the reports of Drs. McGillen and Guitart, the Social Security Administration determined that Flores' condition did not prevent him from working; early in 1997 the agency denied Flores' request for benefits and his request for reconsideration.

In March 1997 Dr. Guitart reported that Flores was "still with oral ulcerations breaking out and pain," and referred him for another biopsy to Dr. Dominick Ettlin, chief of oral medicine at Northwestern Memorial Hospital. Dr. Ettlin reported that Flores was "currently well controlled on low dose prednisone in combination with azathioprine," but noted a "persistent single lesion" on the wall of the left cheek. Ettlin opined that single oral lesions could be successfully controlled with local steroid deposits, and therefore introduced a treatment plan calling for weekly injections over the next six months. In regular entries during this period, Dr. Ettlin noted that Flores' oral lesions continued to improve, though Flores did complain of depression, anxiety attacks, throat tightening, and acid buildup. In October Dr.

Ettlin reported another lesion on the right side; Flores did not return again for further treatment.

Meanwhile Flores' pain and discomfort continued to concern Dr. McGillen. After seeing Flores in May, the doctor jotted down his impressions: "Lot of pain in face. Very nervous. Not sleeping well.... Patient sad, irritable." Dr. McGillen saw Flores in December and recorded that Flores "still has sores in mouth."

In February 1998 Dr. Diana Chen, an associate of Dr. Guitart, enrolled Flores in a research protocol using the antibiotic Dapsone as a steroid-sparing agent. The protocol sought to treat Flores' condition with increasing doses of the study medication, while trying to taper his Prednisone dose and thereby decrease the severe side effects related to the Prednisone. Though Flores' oral lesions had remained stable with less frequent flares, Dr. Chen noted that Flores continued to experience significant mouth pain and muscular weakness. In a narrative report reviewing Flores' progress under Northwestern's care, Dr Chen wrote in July that "Mr. Flores has not been able to successfully lower his dose of Prednisone and has had persistent, painful oral lesions with occasional flares.... He continues, however, to have significant mouth pain, which impairs his ability to eat and speak. He also has complained of muscle pain and weakness, which may be attributable to the Prednisone and/or study medication."

The record reflects additional treatment notes or reports from Dr. McGillen expressing skepticism if not disbelief that Flores could perform any work. After one visit in February 1998, the doctor apparently was astonished to learn that Flores' application for benefits had been denied; in the progress notes for the visit, the doctor had scrawled "Patient can't get disability!" In June Dr. McGillen completed a form entitled "Medical Assessment of Condition and Ability to Do Work–Related Activities." The doctor noted that Flores' condition had initially improved but now was "status quo" and Flores was "still in pain." Asked whether the patient suffered from severe pain, Dr. McGillen replied "Yes!" The pain was so severe that, in the doctor's view, it significantly interfered with sustained attentiveness and concentration. Dr. McGillen declined to answer questions about lifting because "patient has no problem with strength except what the medications (Prednisone) cause—it is the pain and mental effects of meds." Asked to describe any side effects of medication, the doctor mentioned "fatigue/mental clouding." In a final comment scribbled at the bottom of the form, the doctor wrote, "This man really suffers from these ulcers—I really don't see how he can work." Similar observations appear in a short "To whom it may concern letter" that Dr. McGillen drafted the following day. Summarizing the side effects that Flores suffered, the doctor wrote, "Mr. Flores is on a large number of medications all of which inhibit his ability to function in a meaningful way. Mr. Flores is in constant pain, even swallowing causes extraordinary discomfort and his medications keep him groggy [sic] and less than alert during the majority of period of time."

At Flores' request, a hearing was held in June 1998 before an administrative law judge. Testifying through a Spanish-language interpreter, Flores stated that the sores in his mouth and throat had improved with medication, but he still had pain. The pain caused Flores to "feel very desperate." When the pain was bad, he had trouble concentrating on other things. Asked to elaborate, Flores explained that "I have pain in my bones. When I try to do something I get very weak and sometimes I get dizzy. I can't carry anything

up the steps.... I can't stand to carry a weight.... When I am in pain, I don't feel like reading." He did not believe that he could work a full-time job: "My condition is not stable.... I have a lot of pain in all of my body; and my medicine doesn't allow me to be active.... Many times I get nauseated and dizzy from taking the medicine. Sometimes I feel as though I'm drunk. That's the reason why they won't accept me at work." Flores testified that he spends his time watching television and listening to the radio. He takes walks of one or two miles and helps his wife with yard work. When he has a good day, he works with leather to make belts. Flores' testimony was corroborated by his step-daughter, Maria Tonkin. Also testifying at the hearing, she stated that Flores used to be "very calm" but now he becomes easily upset and "explodes at times." She added that his strength has "changed dramatically" and he has "difficulty walking up steps."

The ALJ denied Flores' claim for benefits. In applying the five-step inquiry to assess disability, the ALJ found that Flores was not currently employed (Step 1); he suffered from a severe impairment (Step 2); his impairment did not meet or equal the SSA listings (Step 3); he was not capable of performing his past work (Step 4); and the agency had met its burden of demonstrating that he could perform work in the national economy (Step 5). *See Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir.2001) (explaining the sequential process). At Step 5 the ALJ found that Flores could perform a limited range of light work with some restrictions (e.g., he could not perform a job that required him to speak frequently with others; he could not carry out detailed and complex work tasks or be exposed to pulmonary irritants), and that a sufficient number of such positions existed in the economy. The Ap-

peals Council and the district court affirmed that determination.

## II.

We will affirm the ALJ's decision if it is supported by substantial evidence. *Zurawski*, 245 F.3d at 887. Where as here the ALJ denies benefits, he must "build an accurate and logical bridge from the evidence to [his] conclusion." *Id.* (citations and quotation marks omitted); *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir.1999).

### A. Medication Side Effects

Flores challenges the ALJ's conclusion that he could perform a limited range of light work. More specifically, he argues that the ALJ erred by ignoring the side effects of the Prednisone he was taking for his pemphigus. Flores maintains that the Prednisone caused a host of maladies-including anxiety, fatigue, dizziness, irritability, muscle wasting, and diabetes-that affect his ability to work, yet the ALJ never explained his assessment of the side effects. The ALJ offered only the following conclusory summation: "[A]lthough the Claimant does experience some medication side effects, those effects have been fully considered in reaching the residual functional capacity finding in this decision."

█ The side effects of medication can significantly affect an individual's ability to work and therefore should figure in the disability determination process. *See, e.g., Porch v. Chater*, 115 F.3d 567 (8th Cir. 1997); *Varney v. Secretary of Health & Human Servs.*, 846 F.2d 581, 585 (9th Cir.1988). Here, the issue was squarely placed before the ALJ. At the administrative hearing, Flores' counsel emphasized that Prednisone's side effects comprised the "theory of the case":

> ALJ: Help me with one thing, will you? I read a couple of letters and they say this man's condition is controlled with

Prednisone, okay. So, where are we after that? ... Because if he's controlled, he's got a bad problem. He may still not be eligible. Tell me your ... position.

Atty: If you look at the most recent reports from Dr. McGillen ... it's more the medications and the side-effects from the medications which are trying to control the pemphigus that are causing the functional limits. ... It is the pain and mental aspect of meds.

ALJ: I don't understand that. What does that mean-the mental aspects of the medications?

Atty: He's foggy, he's fatigued. ... Suffers from severe pain. The pain interferes with attentiveness, concentration-and that's really the theory of the case.

■ We have trouble accepting the ALJ's statement that he "fully considered" the medication side effects in assessing Flores' residual functional capacity. The ALJ's single-line summation fails to reflect which side effects he considered, to what extent he considered them, or how he considered them. Yet the record is replete with evidence that Flores complained to his treating physicians about Prednisone's side effects. Progress reports from Drs. McGillen, Guitart, and Chen between mid-1996 and late-1997 note complaints of back-of-neck pain, joint and bone pain; throat swelling; chronic tiredness and weakness; insomnia; depression; irritability; anxiety; dizziness; and "irritating numbness" in posterior, neck, and shoulders. As recently as June 1998, Dr. McGillen was reporting that Flores' medications kept him groggy and inattentive and "inhibit[ed] his ability to function in a meaningful way," and that Flores was "in constant pain [such that] even swallowing causes extraordinary discomfort." And even more recently, in July 1998, Dr. Chen stated that apart from his "significant mouth pain which impairs his ability to eat and speak," Flores suffered "muscle pains and weakness, which may be attributable to the prednisone and/or study medication." These medical records strongly support Flores' testimony that his side effects were debilitating.

The ALJ also glossed over the corroborative testimony of Flores' stepdaughter, Maria Tonkin, who confirmed at the hearing that the otherwise "very calm" Flores had over time become increasingly irritable, even occasionally explosive, and that he sometimes experienced "fogginess" after taking medication. Tonkin testified that medication had caused Flores' strength to "change[ ] dramatically" and that he was having "difficulty walking up steps" and needed to hold on to rails for support. Though the ALJ acknowledged that her testimony was "generally corroborative" of Flores' allegations, he apparently discounted it because "the close relationship between the witness and the claimant and the possibility that the testimony was influenced in favor of the claimant by a desire to help the claimant cannot be entirely ignored in deciding how much weight it deserves." This reason alone is insufficient for discrediting the testimony of a significant witness such as Tonkin.

We have repeatedly held that an ALJ's failure to consider a relevant line of evidence requires remand. *See, e.g., Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001); *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir.2000), *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000). Here, the evidence relating to the medication's side effects could have an impact on the ALJ's

disability determination.[1] The ALJ's failure to address that evidence precludes an informed review and requires that the case be remanded for further findings.

## B. Severity of Pemphigus

■ We reach a similar conclusion with regard to Flores' argument that the ALJ underestimated the severity of his condition and disregarded key medical evidence corroborating his ongoing complaints of mouth pain and lesions. The ALJ had found that Flores' pemphigus was "under good control" and that "the medications have been relatively effective in controlling [his] symptoms."

■ Although an ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally analyze a claimant's evidence that contradicts the Commissioner's position. *Godbey v. Apfel*, 238 F.3d 803, 807–08 (7th Cir.2000). This analysis is necessary for us to track the ALJ's reasoning and thereby carry out meaningful appellate review. *Clifford*, 227 F.3d at 871. There is some question here whether the ALJ fully considered all the relevant evidence concerning Flores' ongoing symptoms. The ALJ relied primarily upon earlier medical reports dating back to September and October 1996, when Flores' response to treatment had peaked and Prednisone was being discontinued.

But Flores' pemphigus reactivated in November 1996, and the medical records since then show at least one ulceration present on each examination. The record is replete with evidence from these later months that Flores continued to complain to his treating physicians of substantial pain, aches, throat swelling, and muscle weakness. These complaints are consistent with Dr. Guitart's repeated warnings that pemphigus is "severe, ... unpredictable, and chronic." Flores is entitled to an express recognition from the ALJ of the existence of the favorable post–1996 medical reports and, if the ALJ does not credit those reports, to an explanation of why he does not.

## C. Daily Activities and Flores' Ability to Perform Light Work

■ Flores further contends that the ALJ erred in concluding that his daily activities were consistent with the ability to perform light work. As characterized by the ALJ, Flores sometimes "prepares his own meals," "is able to do light housework and [go] shopping with his wife once or twice a week," "can drive short distances," "visit[ ] his family and friends," "takes daily walks of one or two miles, does leather work and helps his wife with yard work."

1. We point out that the ALJ also mischaracterized Flores' testimony when he wrote that Flores "reports that he has no problem concentrating or thinking." Contrary to the ALJ's characterization, Flores testified that he did experience difficulties concentrating when he was in pain or when he took pain medication. At the hearing, Flores responded to his lawyer's inquiries about his concentration problems:

Atty: Do you think about think about the pain a lot?
A: Yes.
Atty: Do you have trouble thinking about other things when the pain is bad?
A: Yes.

*   *   *   *   *   *

Atty: Does the pain ever interfere with reading?
A: When I am in pain, I don't feel like reading.

*   *   *   *   *   *

Atty: After you take your pain medication, do you notice anything about yourself? Do you get sleepy?
A: Sometimes.
Atty: Do you sometimes feel not alert?
A: Yes.

Although the ALJ did list Flores' daily activities, those activities are fairly restricted and provide little confidence that Flores can perform the physical exertion requirements of light work. To perform light work, a person must be able among other things to walk and stand for approximately six hours per eight-hour workday. 20 C.F.R. § 404.1567(b); Social Security Ruling 83–10, *Zurawski,* 245 F.3d at 886 n. 6. But minimal daily activities alone "do not establish that a person is capable of engaging in substantial physical activity." *Clifford,* 227 F.3d at 872. *See Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir. 1993); *Hogg v. Shalala,* 45 F.3d 276, 278 (8th Cir.1995). The ALJ identified activities that by their nature are neither strenuous nor prolonged, and therefore they hardly demonstrate that Flores can perform light work. *See Shramek v. Apfel,* 226 F.3d 809, 813 (7th Cir.2000) (claimant's ability to care for the home and her children was not a basis to find her testimony incredible because "[s]uch work by its nature provides the type of flexibility to alternate standing, sitting and walking, and to rest and elevate the legs when necessary").

## D. Treating Physician

Flores further contends that the ALJ erred by not giving controlling weight to the opinions of his treating physician, Dr. McGillen. The ALJ discounted Dr. McGillen's opinions regarding residual functional capacity because he "relied quite heavily on [Flores'] subjective report of pain and limitations" and "seemed to uncritically accept as true most, if not all, of what the claimant reported." The ALJ also found the doctor's opinions unreliable because they were insufficiently substantiated by other medical evidence, and thus were "conclusory." The ALJ added a precautionary reminder that "the possibility always exists that a doctor may express an

opinion in an effort to assist a patient with whom he or she sympathizes."

The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in disability determinations. *See Clifford,* 227 F.3d at 870. If the ALJ finds that the treating physician's opinion is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record," it will be given controlling weight. 20 C.F.R. § 404.1527(d)(2). More weight is to be given to an opinion if the doctor had a lengthy treatment relationship, had reasonable knowledge about the impairment, presents relevant evidence to support his opinion, and his opinion is consistent with the record as a whole. *Id.; see also* Social Security Ruling 96–2p ("Treating source medical opinions are entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527.") Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of treating physicians. *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.") Failure to provide good reasons for discrediting a treating physician's opinion is grounds for remand. *See Clifford,* 227 F.3d at 870. In any event, a treating physician's statement that the claimant is disabled cannot itself be conclusive; the ultimate determination of whether a claimant is disabled is "reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(e)(1).

We take a skeptical view of the ALJ's reasons here for rejecting Dr. McGillen's opinion. Although the doctor may have based his opinion upon subjective pain

complaints that he dutifully recorded, the progress notes of all of Flores' treating physicians confirm the presence of mouth ulcerations that could cause the symptoms voiced by Flores. Indeed, any medical diagnosis necessarily must rely upon a patient's history and subjective complaints. *See Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.1997) (reversing for benefits award where ALJ improperly discounted medical diagnoses as having been based only on claimant's own recitation of events). The opinions of Dr. McGillen were founded upon a longitudinal relationship with Flores dating back to late 1995, when Flores was first hospitalized for intractable mouth pain. Based on his regular visits that subsequently took place with every one or two months, Dr. McGillen carefully recorded complaints of pain caused by ulcers, as well as medication-induced side effects, such as muscle pain, diabetes, irritability, fatigue, and insomnia. In rejecting these reports, the ALJ left unexplained why Dr. McGillen was not entitled to accept Flores' complaints of mouth pain and muscle wasting. The ALJ here cited no medical evidence in the record to undermine the doctor's opinion. Without contradictory medical evidence, the ALJ "impermissibly substituted his own medical judgment for that of the physicians." *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir.1992); *accord Clifford*, 227 F.3d at 870. We conclude that Dr. McGillen's opinion is neither conclusory nor unsupported by the medical evidence, and that in rejecting it, the ALJ essentially substituted his opinion for Dr. McGillen's. On remand the ALJ should reconsider Dr. McGillen's opinion in light of the factors set forth in § 404.1527(d).

## E. Subjective Pain

Finally, Flores maintains that the ALJ improperly discredited his subjective reports of pain. The ALJ found Flores "not fully credible," largely because "the record includes evidence strongly suggesting that the claimant has exaggerated symptoms and limitations." Among the evidence relied upon by the ALJ was Flores' ability to engage in certain daily activities (taking one-to-two mile walks, making leather belts, working in the yard); his trip to Mexico in December 1996; and a demeanor at the administrative hearing that reflected no signs of discomfort.

■ An ALJ may discount a claimant's subjective complaints of pain that are inconsistent with the evidence as a whole. But the ALJ may not disregard complaints merely because they are not fully supported by objective medical evidence. *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995). The absence of objective medical evidence is just one factor to be evaluated along with (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; and (5) functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); *see Knight*, 55 F.3d at 314. Other factors include the claimant's relevant work history and observations by treating physicians, examining physicians, and third parties. *Clifford*, 227 F.3d at 872.

Although our review of an ALJ's credibility assessment is deferential, *see Shramek*, 226 F.3d at 811, we cannot uphold the ALJ's determination here. The ALJ overlooked significant pieces of evidence that related directly to the factors enumerated in the regulations. Most notably, the ALJ brushed aside the numerous progress notes of the treating physicians who documented the multitude of severe side effects that afflicted Flores as a result of the high-dosage Prednisone therapy. In addition, the ALJ failed to meaningfully discuss the supporting testimony of Flores' stepdaugh-

ter, who saw Flores on a weekly basis for three or four hours and was thereby seemingly well-positioned to compare the seriousness of Flores' symptoms over time. Further, the ALJ failed to even acknowledge Flores' solid work history; Flores had been employed each year for the thirteen years before his illness.

The ALJ recited a list of factors that he considered in reaching his credibility decision, but these factors are insufficient. First, the ALJ should not have discounted Flores' pain complaints based on his sporadic performance of household tasks. *See Clifford,* 227 F.3d at 872; *Shramek,* 226 F.3d at 813. The activities that the ALJ attributed to Flores (leatherwork, visiting friends, yard work) were performed on an intermittent basis (not daily), depending upon whether Flores was having, in his words, a "good day." And good days were unpredictable because Flores' condition could change "every half an hour." Moreover, nothing in Flores' description of his daily activities undermines his testimony that his medicine often prevented him from being "active" because it made him "nauseated and dizzy ... as though [he were] drunk." Second, the ALJ improperly discredited Flores' pain complaints based merely on the fact that Flores was sufficiently healthy to have traveled to Mexico in 1996. Nothing in the record suggests that Flores engaged in prolonged or strenuous activity on that trip. Nor should any inference be drawn about his general condition just because he tolerated an international flight; the record, for instance, says nothing about whether Flores experienced any pemphigus-related symptoms during his travels. *See Lauer v. Apfel,* 169 F.3d 489, 494 (7th Cir.1999) (remanding case for ALJ to consider several medical reports suggesting that claimant "may have had trouble working on a sustained and continuous basis ... even though ... he had been able to do some household chores and was able to tolerate

a several-hour flight to Mexico"). And third, the ALJ should not have allowed Flores' appearance at the hearing to sway his credibility assessment. Though the ALJ stated that he accorded Flores' "apparent lack of discomfort during the hearing ... some slight weight" in discrediting Flores' allegations of pain, an ALJ may not discredit a claimant's testimony simply because the claimant failed to "sit and squirm." *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir.2000). That distinction is all the more important in this case, in which the administrative hearing was, in the ALJ's words, "short-lived" and Flores himself had taken pain medication earlier that morning.

### Conclusion

Because the ALJ's decision failed to address significant evidence in the record, the district court's decision is VACATED with instructions to REMAND the case to the Commissioner for further proceedings.