Dorothy **TOWNSEND**, Plaintiff–Appellant,

v.

Jo Anne B. **BARNHART**,[1] Commissioner of Social Security, Defendant–Appellee.

No. 01–2336.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 2001.

Decided Jan. 23, 2002.

---

1. Pursuant to Fed. R.App. P. 43(c)(2), Jo Anne B. Barnhart is automatically substituted for the named defendant, Larry G. Massanari.

Before BAUER, RIPPLE, and ROVNER, Circuit Judges.

## ORDER

Dorothy Townsend was 55 years old when she claims to have become disabled after an automobile accident in February 1996. Before the accident Ms. Townsend, a long-time employee of Motorola, worked as a circuit board tester. Since the accident Ms. Townsend claims that neck and spine pain and related problems prevent her from working. Ms. Townsend's application for disability benefits was denied after a hearing before an ALJ. After appealing unsuccessfully to the district court, Ms. Townsend sought relief in this court. She raises several arguments, all of which relate to her claim that the ALJ unreasonably determined that she did not have any problem with rotating her neck. We vacate the ALJ's decision and remand for further proceedings.

## BACKGROUND

Ms. Townsend was examined by Dr. Radu Jacob of Loyola University Medical Center, an internal medicine specialist and her treating physician, approximately five times in March and April 1996. She complained each time of neck and back pain. Dr. Jacob referred her to Dr. Andrew Zelby of Loyola University, a neurosurgeon, who examined her on April 24, 1996. In his report summarizing her visit, Dr. Zelby stated that Ms. Townsend suffered from a periodic "stabbing type pain" in her neck, "mid to low back pain and spasms in her muscles," and occasional numbness in her left leg. He noted that she was able to drive, that standing was her "worst position," and that she was able to sit for less than one hour, stand for less than one hour, and walk less than two blocks. Dr. Zelby stated that Ms. Townsend had diminished sensation in her right hand, and that a cervical spine x-ray indicated that she suffered from degenerative disc disease at her C4–C5 and C5–C6 vertebrae and "hypodensity in the lateral mass at C3–C4." He concluded that Ms. Townsend's neck pain "appears to be largely muscular in origin" but ordered a magnetic resonance imaging (MRI) because of her "persistent symptoms and [the] abnormality of her cervical x-ray."

In May 1996, Ms. Townsend had an MRI of her cervical spine that indicated "degenerative changes at C4–C5 and to a lesser degree C5–C6." According to the radiology report interpreting Ms. Townsend's MRI, Ms. Townsend had a "posteri-

or disc protrusion with associated osteophyte[2] formation." The report concluded that she suffered from "degenerative changes [at the] C4–C5 and C5–C6" vertebrae. Dr. Zelby noted after one of Ms. Townsend's follow-up visits that she expressed "an aggravation of back pain with gardening, but feels that her neck pain has gotten somewhat better." Dr. Zelby opined that Ms. Townsend's symptoms "stem from her cervical spondylosis"[3] and suggested that her problem be treated conservatively as long as she could tolerate the pain.

Ms. Townsend filed for disability insurance benefits in August 1996. In October 1996 she was examined by Dr. Mohammed Qureshi, a Social Security consulting physician, who noted in his report that she was experiencing pain in her neck which radiated down her left shoulder and arm. Ms. Townsend reported that she felt "better" when she kept still and "takes it easy" but that the pain worsened when she moved her head and neck, walked, or stood. A physical examination revealed that the back of her neck was "very tender" and that she was "not able to do extension of the neck." Ms. Townsend exhibited normal flexion of the neck, although she did it "very slow." Dr. Qureshi additionally observed that Ms. Townsend exhibited "diminished sensation to light touch and pin prick on left and right upper and lower limbs," although she was "not very consistent during examination of the sensory system." Dr. Qureshi also reviewed the radiologist's report interpreting the May MRI, and noted that she suffered from a "large central right paramedian disc extrusion causing impingement of the right anterior spinal cord and

severe narrowing of the right C6–C7 neural foramen, tiny central C3–C4 disc herniation, [and] disc bulging noted at C4–C5 and C5–C6 without cord impingement."

Also in October 1996, Dr. Vidya Madala, a Social Security consulting physician, assessed Ms. Townsend's residual functional capacity, apparently based on her medical file. Dr. Madala presented his findings on form SSA–4734–UB, checking boxes to indicate his conclusions. Dr. Madala opined that she was able to occasionally lift 50 pounds, frequently lift 25 pounds, and both stand and sit for about six hours in an eight-hour workday. Dr. Madala's qualifications do not appear in the record, and it is not clear what evidence he examined in reaching his conclusions. Two other disability examiners, Dr. Jose Gonzales and Dr. Bruce Donnelly, also reviewed Ms. Townsend's medical records in October and December 1996. They both completed a form SSA–831–CE, indicating that Ms. Townsend was not disabled. Their qualifications also do not appear in the record, nor is it clear what evidence they considered.

In December 1996, Dr. Jacob prepared a Physical Capacities Evaluation form for Social Security and a Bureau of Disability Determination form for the State of Illinois regarding Ms. Townsend. He concluded that Ms. Townsend did not have a vertebrogenic disorder as defined in the "vertebrogenic disorders" listing of 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.05 because she did not suffer any herniation. Dr. Jacob also opined, however, that she could not sit, stand, or walk for more than twenty minutes and could not lift or carry any weight, squat or stoop,

---

2. An osteophyte is a "bony outgrowth or protuberance." *See* Stedman's Medical Dictionary, 27th Ed. at 1285 (2000).

3. "Cervical spondylosis" is a stiffening or fixation of the vertebrae, "often applied nonspecifically to any lesion of the spine of a degenerative nature." *See* Stedman's Medical Dictionary at 90 and 1678.

bend over, or perform gross manipulation. He also noted that she suffered from a protrusion at her C4–C5 vertebra. Dr. Jacob concluded that even though she did not suffer from a listed vertebrogenic order, Ms. Townsend's impairments were medically equivalent to the listing in § 1.05 because "even routine activities involving her neck or back is [sic] able to induce significant pain ... interfering with her daily activities."

In December 1996 Ms. Townsend was also examined by neurologist Dr. Douglas Anderson of Loyola University. He noted that she had been treated with pain killers and muscle relaxants but had "no resolution of her pain." He further observed that she could walk only one-half block at a time before she had to stop because of pain. Dr. Anderson reported that Ms. Townsend showed mildly decreased wrist strength on her left side, and that "[s]ensory examination is difficult to evaluate as the patient claims some weakness in the upper left extremity." He also noted that Ms. Townsend had "cervical spondylitic changes on her x-rays" but concluded that surgery was not appropriate at that time.

Dr. Anderson examined Ms. Townsend again in March 1997. After reviewing the results of a February 1997 MRI, which indicated that there was "no definite change in previously centrally herniated disc at the level of C4–C5," he concluded that "there was no surgical legion present." Dr. Anderson further noted that Ms. Townsend suffered from "mild decreased wrist extensor strength on the left which is of unclear significance," stated that she may benefit from a pain clinic, and opined that there was "no reason why she could not return to work on the basis of her present examination."

## CLAIMS HISTORY

Ms. Townsend's application for disability insurance was denied both on initial examination and on reconsideration. She requested a hearing, which was held before ALJ John L. Mondi on November 25, 1997. At the hearing, Ms. Townsend testified that she could not work because of the "constant pain ... in [her] spine and [her] neck." She also testified that she had problems standing and walking when she experienced "excruciating pain," which she suffered two or three times a week. Ms. Townsend added that she had problems bending and stooping and could not sit for more than 10 or 15 minutes at a time, but that she could lift 10 pounds. Ms. Townsend testified that she had been taking Motrin, Aleve, and extra-strength Tylenol for her pain, as well as muscle relaxers. She stated that she was able to "help out around the house and take care of" herself, including, on occasion, driving to the store, fixing meals, doing laundry, and taking care of her one-year-old granddaughter. She also testified that she did "a little" gardening but had to take it "a little at a time." Ms. Townsend stated, however, that she was unable to do "lifting" and "a lot of chores around the house ... like cleaning the carpet [and] washing walls." She also testified that she attended church, but spent "most of the time" laying down.

Ms. Townsend also testified that she had unsuccessfully tried three times to return to work at Motorola after her car accident. She first attempted to return in the summer of 1996 but "couldn't deal with the pain" and "was constantly having swelling." Ms. Townsend also suffered from "sharp pain like two bones grinding together in [her] neck," and had to stop working after a month and a half. Ms. Townsend next attempted to return to work in January 1997, but had to quit after three weeks "because of ... the swelling in my neck and my head, having a headache on one side." She attempted to go

back to work again in April 1997, but quit after two weeks.

At the hearing the ALJ also posed several hypothetical questions to vocational expert Lee Knugson. Knugson first testified that Ms. Townsend's position as a board tester was a light, skilled job, and that her past positions were light and either skilled or semi-skilled. He also testified that an individual with Ms. Townsend's work history and age who could perform light work should be able to return to Ms. Townsend's previous jobs. Knugson further testified, however, that if Ms. Townsend was limited to sedentary activities, she could not return to any of her previous positions. He also opined that if Ms. Townsend's testimony regarding her pain and inability to stand or walk for prolonged times was credited, there were still thousands of sedentary jobs she could perform in the national economy, such as a gate attendant or telemarketer.

On December 30, 1997, the ALJ issued a written decision, finding that Ms. Townsend was not disabled or entitled to benefits. In his decision, the ALJ followed the five-step analysis mandated by 20 C.F.R. §§ 404.1520 and 416.920 to determine whether Ms. Townsend was disabled. The ALJ determined that Ms. Townsend met step one of the analysis because she had not engaged in any "substantial gainful activity" since her accident. The ALJ also found that Ms. Townsend met step two because her impairments, which he characterized as arthritis and a whiplash injury, were severe. With respect to step three, the ALJ found that Ms. Townsend's ailments did not meet or equal an impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1, in part because her impairment did not require surgical intervention and because an MRI had "not revealed herniation." At step four, the ALJ determined that Ms. Townsend retained the functional

capacity to perform light work and could still perform her past relevant work, although he did not discuss her previous failed attempts at returning to Motorola. The ALJ accordingly found that Ms. Townsend was not disabled and denied her application for benefits without reaching step five of the inquiry.

Ms. Townsend filed a request for review of the ALJ's decision with the Appeals Council, which denied the request on February 5, 1999. Thus, the ALJ's opinion constitutes the Commissioner's final decision. Ms. Townsend filed a civil action in federal court, and the parties consented to having the case handled by a magistrate judge. The district court affirmed the Commissioner's determination on July 13, 2000. After Ms. Townsend's Rule 59(e) motion was denied, she timely appealed to this Court.

## ANALYSIS

 Ms. Townsend raises several attacks on the ALJ's decision, all grouped under the main theme that the ALJ unreasonably determined that she did not have any problem with the rotation of her neck. Ms. Townsend's arguments can be reasonably construed as challenging the ALJ's determinations with respect to steps 3 and 4 of the disability inquiry. We will affirm the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *see also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing the Commissioner's findings, we consider the entire administrative record but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commis-

sioner. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000).

■ With respect to step 3, Ms. Townsend argues that the ALJ erroneously rejected the opinion of Dr. Jacob, her treating physician, that her impairment was equivalent to the listing in § 1.05C of 20 C.F.R. Part 404, Subpart P, Appendix 1, which covers disorders of the spine. The ALJ discounted Dr. Jacob's opinion because he relied on Ms. Townsend's subjective complaints in reaching his conclusion. Under § 1.05C, a person is disabled if she has an "other vertebrogenic" disorder with the following symptoms: 1) "pain, muscle spasm, and significant limitation of motion in the spine;" and 2) "appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss." To qualify for benefits, a claimant must either show that her impairment meets all of the specified medical criteria in a listing, or if her specific impairment is unlisted, "present medical findings equal in severity to *all* the criteria for the one most similar impairment." *Sullivan v. Zebley,* 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)(emphasis in original).

Dr. Jacob concluded that Ms. Townsend's impairments were equivalent to those listed in § 1.05, but he did not support his conclusion other than to state that "routine activities involving her neck or back ... induce significant pain ... interfering with her daily activities." Although these symptoms fulfilled the first prong of § 1.05C, Dr. Jacob did not make any findings regarding Ms. Townsend's conditions vis-a-vis the second prong. He did not discuss whether Ms. Townsend suffered any motor loss, muscle weakness, or sensory or reflex loss, nor did he explain how any other symptoms that Ms. Townsend was suffering approximated the listed symptoms. Ms. Townsend did not point to any other evidence showing that she met

or equaled all of the symptoms listed in § 1.05C; she therefore failed to meet her burden of proof. The ALJ properly found that Ms. Townsend was not disabled at step 3.

■ Ms. Townsend next challenges the ALJ's determination at step 4 that she had the residual functional capacity to perform light work and could perform her past job. She first argues that the ALJ erred by discrediting her testimony regarding her pain and not factoring it into his functional capacity determination. The ALJ found that Ms. Townsend's allegations of pain were "inconsistent with her activities ...; use of medications; and her pursuit of treatment" and "with the objective medical findings."

■ We afford an ALJ's credibility determinations "special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000). We will not normally disturb an ALJ's credibility determinations unless they are "patently wrong." *Zurawski,* 245 F.3d at 887. When "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," however, we cannot uphold the ALJ's decision. *Shramek,* 226 F.3d at 811; *see also Green v. Apfel,* 204 F.3d 780, 781 (7th Cir.2000). When considering a claimant's testimony regarding her pain, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski,* 245 F.3d at 887 (quoting Social Security Ruling 96-7p).

The ALJ discounted Ms. Townsend's testimony in part because it "was inconsistent with the objective medical findings (See for example Exhibit 4F)." However, he did not minimally articulate *why* her testimony was inconsistent with the medical evidence, but instead left this court "to ponder what exactly are these 'inconsistencies.'" *See Zurawski*, 245 F.3d at 887. The ALJ's only basis for his conclusion was the bare reference to Exhibit 4F, with no explanation of how that exhibit conflicted with Ms. Townsend's testimony. It is not readily apparent from Exhibit 4F, a report by Dr. Qureshi on October 11, 1996, what the ALJ had in mind when he singled it out as an example of an inconsistent *objective medical finding.* In Exhibit 4F Dr. Qureshi noted that: 1) the back of Ms. Townsend's neck was "very tender" and that she was "not able to do extension of the neck;" 2) she exhibited normal flexion of the neck, although she did it "very slow;" and 3) she exhibited impingement of the spinal cord, disc herniation, and disc bulging. Dr. Qureshi concluded in his report that Ms. Townsend suffered from low back pain, coronary heart disease and hypertension. Nowhere in his conclusion, however, did Dr. Qureshi mention her neck pain. The ALJ did not analyze how these medical findings undermined Ms. Townsend's testimony, and did not specify how her testimony departed from Dr. Qureshi's medical findings. If the ALJ was relying on another doctor's observations, his failure to identify any specific doctor precludes us from determining what evidence he considered in discrediting Ms. Townsend's complaints of pain. Without more of an explanation for his conclusion, we "lack a sufficient basis to sustain the ALJ's credibility determination." *Zurawski*, 245 F.3d at 888.

The ALJ also stated that Ms. Townsend's alleged pain "was inconsistent with her activities, which include caring for an infant and gardening; her use of medications; and her pursuit of treatment." But the ALJ again provided only his bare conclusion with no supporting analysis of *why* these activities were inconsistent with her testimony. The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily undermine her claim of disabling pain. *Zurawski*, 245 F.3d at 887; *see also Clifford*, 227 F.3d at 872. Moreover, the ALJ also did not explain how her "use of medication" or "pursuit of treatment" was inconsistent with disabling pain.

■ The ALJ also did not conduct the proper inquiry after he found alleged inconsistencies in Ms. Townsend's testimony. As we have previously instructed,

> [i]f the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Zurawski*, 245 F.3d at 887 (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994)). Although the ALJ did pose cursory questions to Ms. Townsend about her daily activities and work history, he did not ask

"specific" questions regarding how these activities precipitated or aggravated her pain. In discrediting Ms. Townsend's testimony, the ALJ merely recited the factors he considered, such as her daily activities and medication, but he never analyzed them in any detail. The lack of a more detailed examination of Ms. Townsend at the hearing prevents us from undertaking a thorough analysis of whether the ALJ's ruling is supported by substantial evidence.

Apart from discrediting Ms. Townsend's testimony, the ALJ also concluded that she could perform light work based on the absence of evidence in the record that she suffered any "limitations in walking, sitting and squatting." But there was conflicting evidence in the record on the issue of Ms. Townsend's physical limitations, and the ALJ did not articulate his reasons for finding that no limitations existed. Although the record contains a report from one of Ms. Townsend's examining physicians, Dr. Anderson, stating that she could return to work, the record also contains evidence that she was limited in the duration that she could sit, walk, or stand. For example, Dr. Jacob stated that he was "not sure" if she could engage in sustained competitive work activity because she could sit, stand, or walk only twenty minutes at a time, could not carry or lift any weight, and could not bend over, squat, or stoop through the work day. Other medical reports show that Ms. Townsend could not extend her neck and could only perform lateral flexion of the neck slowly.

There was also conflicting evidence in the record regarding herniation that the ALJ never discussed. For example, although Dr. Jacob noted that Ms. Townsend did not suffer from a herniation in December 1996, a February 1997 MRI indicated that she suffered from a "centrally herniated disc." In assessing Ms. Town-send's residual functional capacity, the ALJ should have articulated why he credited Dr. Jacob's findings over the later MRI. Because he did not provide such an explanation, it is not clear whether substantial evidence supports his decision.

It is also not clear from the ALJ's decision whether he took into account Ms. Townsend's testimony of her failed attempts at returning to work. The ALJ never articulated why, despite her three previous unsuccessful attempts to return to her job, he believed that she could perform the previous work. Because the ALJ did not articulate his reasoning, we must vacate his decision and remand the case for further proceedings.

Ms. Townsend last argues that the district court erred by not proceeding to Step 5 of the inquiry to determine whether she was disabled based on Social Security's "grid rules." Because the ALJ decided that Ms. Townsend was not disabled at Step 4, he did not need to reach Step 5. Since we are remanding this case for further consideration, the ALJ should address the grid rules if he finds that Ms. Townsend cannot perform her past work.

## CONCLUSION

For the foregoing reasons, the ALJ's decision finding Ms. Townsend not disabled is VACATED, and this matter is REMANDED for further proceedings consistent with this order.